CAUTION: NOT TO BE USED FOR
IDENTIFICATION PURPOSES

THIS IS AN IMPORTANT RECORD.
SAFEGUARD IT.

ANY ALTERATIONS IN SHADED
AREAS RENDER FORM VOID

# CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY

| 1. NAME (Last, First, Middle) | 2. DEPARTMENT, COMPONENT AND BRANCH | 3. SOCIAL SECURITY NO. |
|---|---|---|
| DAVIS, NEAL NMN | ARMY/RA | 438   27   6907 |

| 4.a GRADE, RATE, OR RANK | 4.b PAY GRADE | 5. DATE OF BIRTH (YYYYMMDD) | 6. RESERVE OBLIG. TERM. DATE |
|---|---|---|---|
| SFC | E7 | 19660302 | Year 0000 Month 00 Day 00 |

| 7.a PLACE OF ENTRY INTO ACTIVE DUTY | 7.b HOME OF RECORD AT TIME OF ENTRY (City and state, or complete address if known) |
|---|---|
| SHREVEPORT, LA | RT 1 BOX 97 STERLINGTON, LA  71280 |

| 8.a LAST DUTY ASSIGNMENT AND MAJOR COMMAND | 8.b STATION WHERE SEPARATED |
|---|---|
| USAREC NEW ORLEANS RBN RC | FORT POLK, LA  71459-5000 |

| 9. COMMAND TO WHICH TRANSFERRED | 10. SGLI COVERAGE ☐ None |
|---|---|
| USAR CON GP (RET) AR-PERSCOM, 9700 PAGE BLVD, ST LOUIS, MO 63132 | Amount: $ 200,000.00 |

| 11. PRIMARY SPECIALTY (List number, title and years and months in specialty. List additional specialty numbers and titles involving periods of one or more years.) | 12. RECORD OF SERVICE | Year(s) | Month(s) | Day(s) |
|---|---|---|---|---|
| 79R50 RECRUITER--6 YRS-3 MOS//11B50 INFANTRYMAN--13 YRS-6 MOS//NOTHING FOLLOWS | a. Date entered AD This Period | 1984 | 08 | 14 |
| | b. Separation Date This Period | 2004 | 08 | 31 |
| | c. Net Active Service This Period | 0020 | 00 | 17 |
| | d. Total Prior Active Service | 0000 | 00 | 00 |
| | e. Total Prior Inactive Service | 0000 | 02 | 09 |
| | f. Foreign Service | 0005 | 06 | 27 |
| | g. Sea Service | 0000 | 00 | 00 |
| | h. Effective Date of Pay Grade | 2001 | 09 | 01 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service) |
|---|
| MERITORIOUS SERVICE MEDAL (2ND AWARD)//ARMY COMMENDATION MEDAL (6TH AWARD)//ARMY ACHIEVEMENT MEDAL (15TH AWARD)//ARMY GOOD CONDUCT MEDAL (6TH AWARD)//NATIONAL DEFENSE SERVICE MEDAL (2ND AWARD)//GLOBAL WAR ON TERRORISM SERVICE MEDAL//NONCOMMISSIONED OFFICER'S PROFESSIONAL DEVELOPMENT RIBBON WITH NUMERAL 3//ARMY SERVICE RIBBON//OVERSEAS SERVICE//CONT IN BLOCK 18. |

| 14. MILITARY EDUCATION (Course title, number of weeks and month and year completed) |
|---|
| MACHINE GUN LEADERS COURSE, 2 WEEKS, JAN 1998//ARMY RECRUITER COURSE, 6 WEEKS, MAY 1998//INFANTRYMAN COURSE, 13 WEEKS, DEC 1984//ADVANCE NONCOMMISSIONED OFFICER COURSE, 4 WEEKS, NOV 2001//STATION COMMANDER COURSE, 1 WEEK, MAR 2001//OBSTACLE BUILDING, EXPLOSIVES HANDLING AND DEMOLITIONS COURSE, 2 WEEKS, AUG 1986//WINTER OPERATIONS TRAINING//CONT IN BLOCK 18. |

| 15.a MEMBER CONTRIBUTED TO POST-VIETNAM ERA VETERAN'S EDUCATIONAL ASSISTANCE PROGRAM | Yes | No | 15.b HIGH SCHOOL GRADUATE OR EQUIVALENT | Yes | No | 16. DAYS ACCRUED LEAVE PAID |
|---|---|---|---|---|---|---|
| | | X | | X | | NONE |

| 17. MEMBER WAS PROVIDED A COMPLETE DENTAL EXAM AND ALL APPROPRIATE DENTAL SERVICES AND TREATMENT WITHIN 90 DAYS PRIOR TO SEPARATION | Yes | X | No |
|---|---|---|---|

**18. REMARKS**

DATA HEREIN SUBJECT TO COMPUTER MATCHING WITHIN DOD OR WITH OTHER AGENCIES FOR VERIFICATION PURPOSES AND DETERMINING ELIGIBILITY OR COMPLIANCE FOR FEDERAL BENEFITS//IMMEDIATE REENLISTMENTS THIS PERIOD-- 19870519-19920618, 19920619-19951114, 19951115-20010403, 20010404-20040831//SUBJECT TO ACTIVE DUTY RECALL BY THE SECRETARY OF THE ARMY//BLOCK 6, PERIOD OF DELAYED ENTRY PROGRAM: 19840605-19840813//RETIRED LIST GRADE SFC//MEMBER HAS COMPLETED FIRST FULL TERM OF SERVICE//CONTINUE FROM BLOCK 13: KOREAN DEFENSE SERVICE MEDAL//CONT FROM BLOCK 13: RIBBON (3RD AWARD)//MULTINATIONAL FORCE AND OBSERVERS MEDAL//EXPERT INFANTRYMAN BADGE//AIR ASSAULT BADGE//US ARMY GOLD RECRUITER BADGE WITH 3 SAPPHIRE ACHIEVEMENT STAR(S)//US ARMY BASIC RECRUITER BADGE WITH 3 GOLD ACHIEVEMENT STAR(S)//CONT FROM BLOCK 14: COURSE, 1 WEEK, NOV 1997//DRIVER EXAMINER COURSE, 1 WEEK, FEB 1987//PRIMARY LEADERSHIP DEVELOPMENT COURSE, 4 WEEKS, JUN 1987//BASIC NONCOMMISSIONED OFFICER COURSE, 6 WEEKS, NOV 1988//AIR ASSAULT COURSE, 2 WEEKS, JUN 1989//RANGERS INDOCTRINATE PROGRAM, 2 WEEKS, JUL 1989//SNIPER COURSE, 5 WEEKS, JUN 1986//ARMY RED//SEE ATTACHED CONTINUATION SHEET

| 19.a MAILING ADDRESS AFTER SEPARATION (Include Zip Code) | 19.b NEAREST RELATIVE (Name and address - include Zip Code) |
|---|---|
| 905 ROSE CIRCLE BOSSIER CITY, LA  71112 | WANDA KAY DAVIS 905 ROSE CIRCLE BOSSIER CITY, LA  71112 |

| 20. MEMBER REQUESTS COPY 6 BE SENT TO  LA  DIR OF VET. AFFAIRS | X Yes | No | 22. OFFICIAL AUTHORIZED TO SIGN (Typed name, grade, title and signature) |
|---|---|---|---|
| 21. SIGNATURE OF MEMBER BEING SEPARATED | | | BOBBI STARK, GS11, CH, CENTRAL PROCESSING CTR |

| SPECIAL ADDITIONAL INFORMATION (For use by authorized agencies only) |
|---|

| 23. TYPE OF SEPARATION | 24. CHARACTER OF SERVICE (Include upgrades) |
|---|---|
| RETIREMENT | HONORABLE |

| 25. SEPARATION AUTHORITY | 26. SEPARATION CODE | 27. REENTRY CODE |
|---|---|---|
| AR 635-200, CHAP 12 | RBD | 4R |

| 28. NARRATIVE REASON FOR SEPARATION |
|---|
| SUFFICIENT SERVICE FOR RETIREMENT |

| 29. DATES OF TIME LOST DURING THIS PERIOD | 30. MEMBER REQUESTS COPY 4 |
|---|---|
| NONE | Initials |

DD Form 214-AUTOMATED, NOV 88        *Previous editions are obsolete.*        MEMBER - 4

Davis ARR0008

# E M P L O Y M E N T   H I S T O R Y   R E C O R D
## Texas Industries, Inc. and Affiliated Companies

Name: Davis, Neal
(Last) (First) (Middle)

Social Security No. ▮▮▮▮

Sex: M

| EFFECTIVE | CLASSIFICATION | JOB CODE | GRADE | RATE | | SHIFT | REMARKS |
|---|---|---|---|---|---|---|---|
| 12-11-06 | Utiliti Crewmember | 8B003608 | 02 | $24,960.00 | $12.00 | | New Hire |
| 01-08-07 | Production Team Member | 8B00270B | | | | B | Reassignment |
| 10-29-07 | Process Attendant (Existing Mills) | 7AD10708 | 03 | $30,305.60 | 14.57 | B | Promotion |
| 10-17-08 | " " | " | " | $31,457.71 | 15.1289 | B | Increase-Annual Merit |
| 08-31-09 | Storeroom Attendant | 5C00570B | 03 | 32,500.00 | 15.6250 | — | Promotion |
| 9-29-14 | " " | " | " | | 17.19 | | GWI |
| 6-8-15 | " " | 3639GR | " | 36,816.00 | 17.70 | | Merit Increase |
| 1-72-16 | Terminated | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

MM0001
APP 002

# PERFORMANCE APPRAISAL

## HOURLY EMPLOYEES

**ADMINISTRATIVE INFORMATION**

| | |
|---|---|
| EMPLOYEE | *NEAL DAVIS* |
| JOB TITLE | *WAREHOUSE ATTENDANT -899* |
| DATE OF HIRE | *~~12-6-06~~  12/11/06* |
| LOCATION AND DIST/DEPT | *MIDLOTHIAN CEMENT 202 (BV-51732)* |
| EMPLOYEE NUMBER | *725641* |
| REVIEW PERIOD | /          TO          / |

MONTH     YEAR              MONTH     YEAR

**SIGNATURES**

Employee _____  Date *4-20-15*

Employee's Supervisor *Eric M Wilson*  Date *4-20-15*

Next Level Supervisor *Tom Curt*  Date *4.20.15*

---

**BUSINESS ETHICS AND CONDUCT**

This employee accepts the commitment and responsibility to create an environment in which compliance with the company Code of Ethics.

Evidence of Support:

- demonstrates support for company Code of Ethics by personal business conduct.
- assures the receipt of the company Code of Ethics by all current employees and secures the necessary training to assure complete understanding.
- provides new employees with orientation to the Company Code of Ethics
- monitors conduct of employees in their dealings with suppliers, consultants, and customers.

---

Signatures indicate that the employee and his or her manager have discussed the employee's performance for the period covered by this review

**MM0039**
APP 003

## Evaluation of Current Performance

Use this scale to evaluate the employee's performance for this review period for each performance standard.

**Unacceptable** – performance is unacceptable and is noticeably below competent standards.  Requires immediate improvement to meet minimum performance expectations.

**Needs Improvement** – performance is not yet consistent and is sometimes below competent standards.  Further improvement is required, but progress is evident.

**Proficient** – performance is completely satisfactory and sufficient with what is expected of a capable and well-qualified person.

**High Performing** – day-to-day performance is excellent and consistently exceeds competent standards.

**Exceptional** – performance is outstanding and is consistently far and above competent standards.

For each of the performance standards, a definition of **Proficient** has been provided.  Use this definition as a guide for completing your evaluation.

A

| Performance Standards | Circle one for each standard. | | | | |
|---|---|---|---|---|---|
| | U | NI | P | HP | E |
| 1.**SAFETY** – adheres to all safety practices, policies, rules, and regulations at all times when completing tasks; takes responsibility for the safety of others. | 0 | 1 | (2) | 3 | N/A |
| 2.**JOB PRODUCTIVITY** – meets or exceeds the amount of work required for the job most of the time; completes assigned tasks on time. | 0 | 1 | (2) | 3 | 4 |
| 3.**DEPENDABILITY** – follows correct work procedures; work is accurate and requires minimal re-work; will always seek help or ask questions when unsure of work procedures. | 0 | 1 | (2) | 3 | 4 |
| 4.**JOB KNOWLEDGE AND SKILLS** – uses appropriate skills on the job; applies required knowledge and information to meet job expectations; is capable of being cross trained for other jobs. | 0 | 1 | (2) | 3 | 4 |
| 5.**FLEXIBILITY** – effectively deals with a variety of situations to resolve problems; copes well with uncertainty and change in the workplace. | 0 | 1 | (2) | 3 | 4 |
| 6.**ATTENDANCE** – attendance is well within the guidelines of established policies and procedures; arrives on time and observes all work schedules. | 0 | 1 | (2) | 3 | 4 |
| 7.**WORK HABITS** – consistently able to work with minimum supervision and always accountable for own actions; keeps work area clean  and free of hazards; looks for ways to improve work procedures. | 0 | 1 | (2) | 3 | 4 |
| 8.**TEAMWORK** – consistently works well with others to complete common tasks or projects; willing to help others when asked to do so. | 0 | 1 | (2) | 3 | 4 |

**Performance Total** [ ] + [ ] + [16] + [ ] + [ ] = [16]

MM0040
APP 004

**B**                                       Overall Performance Evaluation

## Performance level

0 - 6   Significant improvement must occur as a condition of continued employment.  Minimum standards are not met for a significant portion of position requirements

7 - 13   Some results are frequently below acceptable standards and improvement is required in those areas

14 - 19   Overall performance completely meets performance requirements; effort and results are that of a qualified person for this position.

20 - 28   Results are excellent and overall performance is consistently above expectations for many of the standards required for the position

29 - 31   Results achieved are far above standards and performance exceeds position requirements in most standards

Place an x on the scale using the performance level total

| 0 | 7 | 14 | 20 | 29 | 31 |
|---|---|---|---|---|---|
| Unacceptable | Needs Improvement | Proficient | High Performing | Exceptional | |

**C**          **Career Plans (to be completed by Manager and Employee)**

Briefly describe employee's desired career goals with Martin Marietta _____

GOAL IS TO TRANSFER TO HUMAN RESOURCES &

ASSIST IN HELPING

Is employee willing to re-locate? yes___✓_____ no_____

Geographic preferences: ANY _____

**D**          **Development Plan for the next 12 months (to be completed by Manager and Employee)**

FINISH MASTERS DEGREE AND BECOME HUMAN RESOURCES

MANAGER.

**E**                    **Comments Concerning This Review Period**

Manager: _____

Employee: _____

# PERFORMANCE EVALUATION FORM
## NON-EXEMPT OPERATIONS EMPLOYEES



| General Information | |
|---|---|
| **Employee Name:**<br>Neal Davis | **Employee Clock Number:**<br>725641 |
| **Employee's Job Title:**<br>Warehouse Clerk | **Location:**<br>Midlothian Cement |

| Rating Scale & Definitions | |
|---|---|
| **5: Performance significantly exceeds job requirements** | *Outstanding or Excellent performance. Clearly exceeds job requirements/expectations. Regularly assumes additional responsibilities beyond those required. (This rating usually reserved for the top 10% of employees.)* |
| **4: Performance exceeds job requirements** | *The employee consistently performs at an exceptional level within the job criteria and frequently above and beyond expectations.* |
| **3: Performance meets job requirements** | *The employee consistently meets the full expectations of the position.* |
| **2: Performance does not meet job requirements** | *The employee does not consistently perform at the required level. Improvement is necessary.* |
| **1: Unacceptable performance** | *The employee's performance is clearly unacceptable with the criteria set for the job. Immediate improvement must occur.* |
| **Comments and Examples** | ***Ratings given for each key performance indicator below should be supported with comments, examples, and/or metrics (when applicable) in the spaces provided. Supervisor should also note significant achievements and areas for improvement.*** |

| Key Performance Indicators |
|---|

**SAFETY**     RATING ASSIGNED: _____3_____

*Evaluate the extent to which the employee contributes to maintaining a safe work environment; actively supports TXI's safety program; follows safety rules, policies, regulations, procedures and safe work practices at all times; attends safety training as appropriate; recognizes and reports unsafe conditions and actively works to remedy them; and maintains an accident / incident free safety record.*

Is familiar with and enforces MSHA regulations

**JOB KNOWLEDGE AND SKILLS**     RATING ASSIGNED: ___4___

*Evaluate the extent to which the employee understands and can perform the responsibilities of his or her position; is knowledgeable in and applies the latest techniques, skills, technology and methods pertinent to his or her area of responsibility; and pursues further training or education to improve job know-how, skills and professional capabilities.*

Neal's is technically adept at all facts of his work.

1

**QUALITY OF WORK**                                    RATING ASSIGNED: _____3_____

*Evaluate the extent to which the employee's work consistently conforms to established standards and procedures; demonstrates attention to specific directions; is accurate, thorough, and presentable; and meets the needs and expectations of the organization.*

Neal takes pride in his work and ensures that any document that leaves his desk will be error free

**PRODUCTIVITY, ACCOMPLISHMENT OF GOALS**              RATING ASSIGNED: ___4_____

*Evaluate the extent to which the employee sets and/or accomplishes appropriate goals and objectives and completes an appropriate volume of work using effective time management; demonstrates commitment and enthusiasm in carrying out his or her plan of action; follows instructions and achieves objectives in a timely and competent manner.*

Neal regularly completes work that is assigned on schedule and measures results through established metrics and analytical benchmarks.

**ANALYTICAL SKILLS AND PROBLEM SOLVING**              RATING ASSIGNED: ___3_____

*Evaluate the extent to which the employee can analyze a situation or problem and draw logical and valid conclusions; identifies all critical areas of the issue and can make sound recommendations; proposes several viable alternative solutions based on recognition of multiple options; and is able to foresee the impact decisions may have on other people or departments.*

Neal identifies practical solutions and also willingly shares knowledge so that others don't have to reinvent the wheel.

**INTERPERSONAL AND COMMUNICATION SKILLS**             RATING ASSIGNED: ___4_____

*Evaluate the extent to which the employee demonstrates competence in expressing ideas verbally and in writing; presents information clearly tactfully and concisely and is able to communicate effectively in all situations; listens carefully and understands directions; can express an opinion or position while also considering other conflicting points of view; provides accurate and timely information when required; and is considerate and respectful of all employees as well as different cultures.*

Neal regularly solicits constructive feedback and builds consensus.

2

MM0043
APP 007

| **TEAMWORK, COOPERATION AND CUSTOMER SERVICE** | **RATING ASSIGNED:** ___3___ |
|---|---|

*Evaluate the extent to which the employee works effectively and efficiently with others; is willing to offer or accept assistance when necessary; is flexible and willing to compromise or make concessions in the best interests of the organization; achieves positive relationships with customers, visitors, and all levels of company staff; demonstrates a professional demeanor at all times; and has merited the trust and respect of others within and outside the department.*

Draws on the strengths of team members and treats no suggestion or request as trivial or minor.

| **ATTENDANCE AND PUNCTUALITY** | **RATING ASSIGNED:** ___3___ |
|---|---|

*Evaluate the extent to which employee adheres to work hours, is present and on time for work every day; schedules time off in advance; makes arrangements for coverage during absences; and arrives at meetings and appointments on time.*

Neal is consistently dependable and conscientious and fully reliable in terms of attendance and punctuality.

| **INITIATIVE,  CREATIVITY AND INNOVATION** | **RATING ASSIGNED:** ___4___ |
|---|---|

*Evaluate the extent to which the employee is aware of what needs to be done and demonstrates the energy and self-motivation to begin and complete work requirements without prompting from others; exercises independent judgment;  generates new ideas and approaches his or her work in creative or imaginative ways; questions the status quo; and strives for continuous improvement.*

Questions common practices in order to identify better ways of doing things as to innovation. Regularly takes on responsibility for areas beyond his basic duties.

| **LEADERSHIP** | **RATING ASSIGNED:** _____3_____ |
|---|---|

*Evaluate the extent to which the employee demonstrates a genuine concern for others; sets a positive example for others to emulate; demonstrates integrity and good stewardship; encourages and motivates others to strive for excellence; puts accomplishment of the task before personal concerns; is dependable, reliable; assumes an effective leadership role when appropriate; and assists with training, mentoring and/or coaching of others.*

3

Listens actively and allocates his resources appropriately in the face of competing demands

**EMPLOYEE OVERALL TOTAL SCORE:** __34__    **OVERALL AVERAGE SCORE:**__3_____

### Employee Goals

*Describe specific goals for the next 12-month period, along with agreed-upon plan for attaining goals, the time frame for achieving goals, and the method to be used for measuring achievement*

Becoming more proficient in using technology to increase efficiency.

Structure the days into incremental activities.

Keep focused whenever unexpected events play havoc with best-laid plans

Understand and implement the key benefits of organization and planning.

### Employee Comments

4

MM0045
APP 009

| Employee's Signature: | Date: 8-22-14 |
|---|---|
| Immediate Supervisor's Signature: Eric M. Wilson | Date: 8-22-14 |
| Manager's Signature: | Date: 9-10-14 |
| Human Resources Signature: | Date: |

5

## Texas Industries, Inc.
## Employee Performance Evaluation

Employee: Neal Davis

Job: Warehouse clerk                                    Location:  Midlothian

Supervisor Name: Lucy Tovar

**Employee Accomplishments/Performance (Important Job Achievements):**
Neal supported the warehouse team to move all consumables out of the warehouse.
Neal performs all activities related to his job.
Neal supported the warehouse team by taking the lead on scrap sale when the Management was not in place. He also supported all the initiatives the Operations Director put in place for scrap collection and sale successfully.

**Employee Strengths (Knowledge and Skills):**
Neal is a very dependable employee; he is always on time and at work every day.
He also has a good attitude when I assign him specific tasks to be performed.
Neal likes to share his ideas related to warehouse housekeeping and organization.
He is a good team player he is always willing to help the team to get the job done.

**Employee Developmental Needs (Areas for Improvement):**
Neal wants to improve and have a leadership role in the warehouse. To prepare him for that opportunity, I would like for Neal to become more active on the process for picking orders. This will help us to become more efficient and proactive in the management of our inventory. Also it would be very beneficial for Neal to get additional training on EAM, learning and understanding how the transactions are processed and the financial impact to TXI.
Neal should continue to process all warehouse receiving and issues daily to be able to maintain the accuracy of our inventory.

**Employee Action Plans (Specific Goals to Build Strengths and Improve Performance):**
I would work with the EAM/ORACLE internal experts so that they can visit us more frequently and spend time with Neal on a 1-1 sessions. This will help him to understand the cause and effect of our system and inventory transactions.
Neal should continue to support all the warehouse activities and Management initiatives related to cycle counts, house-keeping, obsolete inventory identification, organizing and disposition among others.
It is important for Neal's advancement to continue his education towards his bachelor's degree.
I would like for Neal to continue to lead the warehouse housekeeping activities
Neal should participate more actively in the inventory reduction project

| | | | |
|---|---|---|---|
| _Supervisor Signature_ | _1/8/13_ | Second Level Signature | Date |
| Supervisor Signature | Date | | |
| _Neal Davis_ | _01/08/13_ | Human Resource Review | Date |
| Employee Signature | Date | | |

Rev. 8/08                                7

MM0047
APP 011

## Texas Industries, Inc.
## Supervisor Self-Evaluation

Employee Name:  Neal Davis

Supervisor Name: Lucy Tovar

**Supervisor Strengths (How I help this employee's overall performance):**
Because of my Warehouse and Inventory Control experience, I can help Neal to learn different processes that can complement his knowledge that will help him  do his job in a more effective and productive way. I can also help Neal learn the cause and effect of our Oracle transactions based on my Oracle experience.

**Supervisor Developmental Needs (Areas for Improvement):**
Listening skills can help me to further develop his performance. Spend more time with warehouse associates so I can identify their challenges and needs. Then I can provide solutions, tools and resources to help them accomplish their goals.

**Action Plan / Comments:**
Apply listening methods to understand and help Neal in his job. Developing this skill further can help me to understand and be understood. Spend more time out in the warehouse.

Rev. 8/08                                            8

**MM0048**
APP 012

## Texas Industries, Inc.
## Employee Self-Evaluation

**Employee Name:** Neal Davis

**Employee Accomplishments/Performance (Important Job Achievements):**
O- Coordinated warehouse Scrap sale which led to team to exceed goal during FY12
O- Supported team to down size warehouse and sale of obsolete inventory
O- Perform all activities related to job and fill in during the absence of other employee
O- Took Led in the warehouse when the absence of management

**Employee Strengths (Knowledge and Skills):**

O- Consistently go above and beyond his job description to accomplish task
O- Takes led in warehouse housekeeping, and daily safety inspection
O- Has can do attitude, always willing to help the team to get the task done

**Employee Developmental Needs (Areas for Improvement):**
O- Cross training in leadership role in warehouse management
O-Would like more training in general procurement standard operating procedures
O- Improve KPI's to exceed the standard set by Management team

**Employee Action Plans (Specific Goals to Build Strengths and Improve Performance):**
O- Received training in Oracle to become subject matter expert in all areas of job
O- Support management to excel in all areas of KPI, s
O- Continue to ask question, take initiative, continue education to complete bachelor degree

| | | |
|---|---|---|
| _signature_ 1/8/13 | | |
| Supervisor Signature      Date | Second Level Signature      Date |
| _signature_ 01/08/13 | | |
| Employee Signature      Date | Human Resource Review      Date |

Rev. 8/08

**Texas Industries, Inc.**
**Employee Performance Evaluation**

Employee: Neal Davis

Job: Store Room Attendant  I/Receiving

Location: Midlothian Cement

Supervisor's Name: Del Panther

**Employee Accomplishments/Performance (Important Job Achievements):**
Neal came to the store room in August of 2009 via of transferring from the Mill room. Neal immediately fit right in and grasps his position with dedication and alert concern. He has contentiously made suggestions for improvement and has taken the initiative to make changes. Some of these improvements included cleaning and reorganizing some to the consumable areas, marking locations of items in the tool room, sign out sheets for contractors using TXI compressed gasses and reorganizing the receiving office. He fulfills his position with pride and concern for making thins better for all.

**Employee Strengths (Knowledge and Skills):**
He communicates well with all store room personnel, fellow employees, and management. He has an excellent working attitude and ethics. He does not hesitate to make suggestions for improvement in the proper business manner, both in group discussions and one-on-one.  He plans his work load ahead of time, setting priorities and making adjustments when needed. Neal communicates his ideas and suggestions with his supervisor and accepts alternatives or modifications to his suggestions. He is very adapt in giving feed back

**Employee Developmental Needs (Areas for Improvement):**

Because of the short time in the store room and the vast number of parts to know, Neal continues to improve in his knowledge and the location of these parts. He is navigating the Oracle software satisfactorily, but still needs to gain speed and the tools available in its usage.
Neal should take a little more time in evaluating the effect of his actions to include all throughputs on others.

**Employee Action Plans (Specific Goals to Build Strengths and Improve Performance):**

Set up plan for cross training to cycle count. Increase knowledge of shipping terms and available freight carriers. Assist in the design and planning of reorganizing the store room, including a long range plan. Continue to express his ideas, concerns, suggestions and actions with his supervisor and fellow employees.

**MM0050**
APP 014



| | | |
|---|---|---|
| _Supervisor Signature_ | 4-12-10 | _Second Level Signature_ |
| Supervisor Signature | Date | Second Level Signature | Date |
| _Employee Signature_ | 4-12-10 | 4/27/10 |
| Employee Signature | Date | Human Resource Review | Date |

4.13.10    4/16/10

MM0051
APP 015

## Texas Industries, Inc.
## Supervisor Self-Evaluation

Employee Name: Neal Davis

Supervisor Name: Del Panther

**Supervisor Strengths (How I help this employee's overall performance):**
Manage with minimal supervision, giving guidance to assist in his suggestions and ideas when appropriate. Allowing Neal to set his own priorities while keeping a watchful eye on his progress. Asking for and seeking his opinions and ideas and discussing in more depth. Follow through on his concerns and discuss the progress and actions being taken. Keeping him abreast of current events and future policy improvements.

**Supervisor Developmental Needs (Areas for Improvement):**

Discuss and set a schedule for cross training. Discuss Neal's short and long range career goals and the tools he needs to achieve them. Discuss other tools he needs to make improve and make his current assignment more attractive and enjoyable.

**Action Plan / Comments:**

Discuss timing for his cross training and who will fill in his position during his cross training. Continue follow through his strengths and improvement needs and tools he needs for accomplishment.

# Texas Industries, Inc.
## Employee Self-Evaluation

Employee Name:    Neal Davis

**Employee Accomplishments/Performance (Important Job Achievements):**
Train on customer service /customer relationship
Received training on inventory management
Commended on housekeeping in Store Room

**Employee Strengths (Knowledge and Skills):**
Customer/Vendor relationship
Work well with others
Keep Eye on Receiving Hold Report, will not receive in items not delivered.
Focus on reducing unnecessary spending.

**Employee Developmental Needs (Areas for Improvement):**
Needs cross training in other areas of Store Room
Needs cross training on various areas of Plant.
Improve on helping reducing cost

**Employee Action Plans (Specific Goals to Build Strengths and Improve Performance):**
Request for training and help when needed
Correspond more with buyer and accountant to reduce receiving hold report
Prioritize work and stay focus on task
Build a plan to help reduce cost and monitor each department budget.

| | | | |
|---|---|---|---|
| Supervisor Signature | 4-12-10 | Second Level Signature | Date |
| | Date | | |
| Employee Signature | 4-12-10 | Human Resource Review  4/27/10 | Date |
| | Date | | |

Rev. 8/08

## Texas Industries, Inc.
## Employee Feedback to Supervisor  (Optional)

Employee Name:  Neal Davis

Supervisor Name: Del Panther

**Things My Supervisor Does Well:**

- Focus on reducing cost throughout Plant
- Team Player

**Things My Supervisor Could Do To Help Improve My Performance:**
**Learn How to Operate Fork lift**
**Take some pressure off by helping receiving**
**Focus more on Storeroom House keeping**

**Other Comments:**

Rev. 8/08                                    2

**MM0054**
APP 018

Memo:
Date: September 7, 2010

Meeting between Neal Davis and Del Panther

**Purpose**: to discuss Neal's perspective of his position, analysis of his quality and quantity of job fulfillment and improvements that he could make and tools him could use to make improvements (without utilizing an additional person in the store room).

Neal was informed the purpose of the meeting was to discuss his position in the store room and as a follow up of a similar meeting that was held on August 4, 2010. Neal was ask how he felt he was doing in his present position and he said he tries to set time aside to do task but contentiously gets interrupted by internal (TXI personnel) and external customers(vendor deliveries). I ask him to give some examples and how he could decrease the number of interruptions. He did not have any specific suggestions (except for adding an additional person to the store room staff). I offered some suggestions, i.e. eliminating unnecessary conversations by politely informing the interrupter that had work to be done. I gave him an example that if he spoke with 20 people, during the day, for 3 minutes each, that would consume 1 hour of his time. I suggested that he take time for the necessary conversations, but be polite and excuse himself from the unnecessary ones. Neal expressed that "PR" was a very necessary part of his position. I acknowledged that he needed to be polite to all but may conversations could be shortened or eliminated.

I reminded Neal how his position impacted others and the reason he needed to process paperwork promptly and put materials and parts in their designated location with the same promptness. Neal kept repeating that there was too much work for one person to handle. I reminded him that Matt had completed all receiving (electronic entries and placement of material on Friday September 3rd when he was off but he just countered and said that Fridays were slow days for receiving.

When Neal was given examples of items that were not received electronically and had individuals names on them (direct charge items); items that had been received electronically but had no part number on them or put away for one week or more, he became very defensive and said that he had never been criticized before. I reminded him that this was constructive criticism and for the purpose how it impacted others.

I and others have continuously noticed that it is hard to find Neal in his area and vendors come to them to them to receive items. I suggested to Neal at this meeting and at the previously meeting that he inform at least Mike Martinez when he was going to leave his area and approximately when he would be returning.

So Neal can focus on receiving, I suggested that he leave price quoting and vendor sales to the buyers. (I have assigned Matt and Linda as the contracts for Grainger VMI).

Even after furnishing Neal with suggestive tools, he continued to focus on getting an additional person to help him instead of what he could do to improve his time

management. Mid way through out discussion, Neal stated that he was going to bid on another job within TXI and leave the store room. I ask him if he thought this was a rash decision and to think it over for a few days.

**Conclusion**: Neal spends far too much time is conversations with others, dwells to much time on accountability of others, and has a mind set that only another individual to help him will be the solution rather focusing of what he could do to manage his time better and focus on his primary duty of receiving.

Respectfully submitted,

Del Panther, C.P.M.
Procurement Supervisor
TXI, Midlothian Cement

## Texas Industries, Inc.
## Employee Performance Evaluation



Employee:     Neal Davis

Job:     Process Attendant (existing mills)     Location:     Midlothian

Supervisor Name:     Kelly Pitner

**Employee Accomplishments/Performance (Important Job Achievements):**
 Neal you have trained in the mill operator's position for several months now when time permitted and I think that you could fill in at that position should we need you to. Your attendance has been improving and your personal safety record is good. You always make sure to complete your safety inspection and you report any safety concerns right away.

**Employee Strengths (Knowledge and Skills):**
 Neal you take the time to check all your equipment to make sure that they are lubing properly. You make sure that what needs to be greased is getting greased. You communicate well with the mill room operator and the other team members.

**Employee Developmental Needs (Areas for Improvement):**
 Neal I think that you could take more pride in the work that you do when it comes to your house keeping duties. I think that you need to get more involved with any problems we are having in the mill room and help trouble shoot these problems.

**Employee Action Plans (Specific Goals to Build Strengths and Improve Performance):**
 Neal I want you to get more involve with any problems that happen in the mill room to better prepare you for the future should you ever become a mill room operator. I would also like for you to take on different tasks without being told to do them. Look around our areas to see what you can do to make them look better, do the little extras.

| Supervisor Signature | Date 3-21-09 | Second Level Signature | Date 3/23/09 |
| Employee Signature | Date 3-21-09 | Human Resource Review | Date 7/2/09 |

Rev. 8/08

MM0057
APP 021

## Texas Industries, Inc.
## Supervisor Self-Evaluation

Employee Name:     Neal Davis

Supervisor Name:     Kelly Pitner

**Supervisor Strengths (How I help this employee's overall performance):**

    Neal during the past few months you have taken on a new job position and I have provided you with the training you need to perform that job. If you had any questions about your job or wasn't sure what to do about something I would make recommendations or suggestions that I thought would help you. I have made myself available to help you trouble shoot any problems you have during your learning process. I have encouraged you to work safely and to watch out for the safety of your team members. I provided you with our departmental safety meetings every month and give you the opportunity to participate.

**Supervisor Developmental Needs (Areas for Improvement):**

    I think that I need to make more frequent checks in all areas of the plant and have visits with the employees to check on there needs and concerns. I think that I need to be more direct with the employees and hold them more accountable for their areas and for their actions.

**Action Plan / Comments:**

    Neal I will continue to answer any questions you have about your job and make suggestion that I think that will improve your performance. I will continue to encourage working safely and providing you with safety information that will help you to work safe. I will try to make myself more available to you and utilize my past experiences to help you when you need help.

MM0058
APP 022

## Texas Industries, Inc.
## Employee Self-Evaluation

Employee Name:  Neal Davis

### Employee Accomplishments/Performance (Important Job Achievements):

o Mill Room - Can Run Mill Room without supervision

o Accidents - Zero recordable accidents in two years,

o Trouble shooting - Trouble shoot Areas well, Has Some knowledge Running #5 Mill

o Duties - Fulfill my obligations/ keep Assigned Areas clean,

### Employee Strengths (Knowledge and Skills):

o INTegrity - Do whats right legally and morally

o Duty - fulfill obligations of Assigned Duties

o Not Afraid to Ask for help when Needed,

o Focus on safety, Not Afraid to correct A unsafe Act,

### Employee Developmental Needs (Areas for Improvement):

o Master #5 Mill in case Needed

o Retrain on loader, to maintain training

### Employee Action Plans (Specific Goals to Build Strengths and Improve Performance):

o Ask to be cross train, when Assignment are completed,

| | | | |
|---|---|---|---|
| Supervisor Signature | 3-21-09 | Second Level Signature | Date |
| | Date | | |
| Employee Signature | 3-21-09 | Human Resource Review | 4/2/09 |
| | Date | | Date |

Rev. 8/08                    3

## Texas Industries, Inc.
## Employee Feedback to Supervisor  (Optional)

Employee Name:     Neal Davis

Supervisor Name:     Kelly Pitner

**Things My Supervisor Does Well:**

o Selfless Service - Puts the Welfare of TXI, and Subordinates before his own.

o Team Player - Will not hesitate to help Employees when needed.

o Integity - Does what's right legally and morally

**Things My Supervisor Could Do To Help Improve My Performance:**

O Utilize me, by cross training me in various Areas of the plant.

**Other Comments:**

Rev. 8/08                                        4

MM0060
APP 024

## IMPROVING PERFORMANCE IS A TWO-WAY PROCESS . . . .

A.  Improving performance is necessary for continued Company success and growth.  The success and growth of TXI is measured in many ways (e.g. Assets/Equity, Stock Price, Price/Earning Ratio, etc.).  These statistics are a summary of all employees' performance and are evaluated by the owners (shareholders) of the Company, TXI's Board of Directors and financial institutions.  These outside-of-the-company evaluations concentrate on an analysis of the end results of accomplishments. They do not necessarily consider the way in which the results are obtained.

It is the policy of the Company that performance reviews take place annually during the month of the employee's <u>birth date</u>.  Although there is a correlation between performance and salary increases, it is not intended that the performance review and salary recommendation be done at the same time.  It is better to separate the timing of the two so that discussions concerning performance, training and development, and career are not confused with discussions and/or issues involving the amount of a salary increase.  The primary purpose of a performance review is to aid in the identification, evaluation and development of an individual's performance.

### Supervisor / Employee Evaluation

Supervisor's are responsible for communicating this process to the employee.  The process is to be completed annually.  All three questions should be answered by both the Supervisor and the Employee.  Supervisor comments are noted on (Page 3) and Employee comments are noted on (Page 2). After the form is completed by both parties, an exchange of written comments should take place.  An open, two-way discussion will take place to insure understanding by both parties. **Supervisors will ask the employee if review comments are to be included in the employee's personnel file.  Section B on Page 1 of this form is to be used for this purpose.**

### Supervisor / Employee Mutual Option

**Upside Down Review** - With an "upside down" review, the direction of the discussion is reversed giving the employee an opportunity to tell his/her supervisor how s/he helps/hinders the employee's effectiveness and how the supervisor could improve. (Page 5 is used for this process).  Page 4 is used for the supervisor's self-evaluation.  It is the employee's option to participate in this type of review.  Feedback received using this  method **does not** need to be part of the submitted appraisal package unless the employee chooses to do so.

**Horizontal Reviews** - Horizontal reviews take place when the employee solicits feedback on his/her performance from peers, co-workers, team members, or customers.  Feedback is received in the same manner as with the employee's supervisor.  Employee's wishing to use this process should make copies of Page 3 and mail them to the appropriate individuals with a short note of explanation.  Feedback received using this method **does not** need to be a part of the submitted appraisal package unless the employee chooses to do so.

When employees use all of these combined methods, they have completed what is referred to as a **"360 degree"** evaluation process.  Feedback received from **multiple** sources is viewed by many as the optimal tool for enhancing performance, particularly when a company is trying to develop a more open, communicative culture.  When people receive honest, specific feedback from their supervisors, co-workers, team members and customers, they often come to understand how their behaviors affect others - and the need for change in some of those behaviors.

B.  A performance review for _Neal Davis_ was conducted on _8/3/08_.
<br>Name/SSN · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · Date

S/he (does) (does not) want this review to be a part of his/her employee file.

An "upside down" performance discussion was conducted. (yes) (no)

_Ned Davis_ · · · · · · · · · · · · · · · · · · · · · · _8/3/08_
Employee · · · · · · · · · · · · · · · · · · · · · · · · · · Date

_Kelly Pitman_ · · · · · · · · · · · · · · · · · · · _8/3/08_
Supervisor · · · · · · · · · · · · · · · · · · · · · · · · · · Date

KEYED
AUG 0 5 2008
JOHNNA JONES

MM0061
APP 025

## EMPLOYEE COMMENTS
### (Self Evaluation)

Answer the following three (3) questions in the space provided below and exchange with the supervisor conducting the review. If additional pages are used, please include your name and the date on each.

1.      What were the most positive aspects of my performance during the last 12 months?

2.      What aspects of my performance during the last 12 months need improvement?

3.      Which steps can I take which will best improve my performance in the next 12 months?

1.) - Takes initiative to corrects problem when they occur.
 - Strive to keep area, the best in the mill room.

2.) - asking for help when needed.
 - Cross training

3.) - Conduct more cross training outside mill room
 Communicate more with mill room operator/supervisor.

MM0062
APP 026

## SUPERVISOR COMMENTS
### (EMPLOYEE PERFORMANCE)

**EMPLOYEE NAME: Neal Davis**  |  **EVALUATOR NAME: Kelly Pitner**

Answer the following three (3) questions in the space provided below and exchange with the employee. If additional pages are used, please provide the date and employee's name on each.

1.  What were the positive aspects of this employee's performance during the last 12 months?

2.  What aspects of this employee's performance during the last 12 months need improvement?

3.  What training, education and/or experience does this employee need in order to meet current job expectations and/or to be prepared for future positions?

1.  Positive aspects- Neal you were awarded the position as Process Attendant (existing mills) about eight months ago and since that time I think you have done a good job learning the operation. Your knowledge of your position is good and continues to grow each day. You make sure that you check the oil levels in the equipment and make sure the levels are maintained. Always complete your daily greasing of the equipment. Make sure the samples are at the lab on time. You communicate well with the mill operator and with the other team members. I think that you have a good attitude towards your job and you always are up beat and positive. I think that you are a team player and are willing to help out in other areas of the plant if needed. You help make sure that the mill floor is swept before the end of our shift. You make sure that your daily safety inspection is completed and turned in and your personal safety record is good.

2.  Neal here is a few things that I think you could improve on in the next twelve months. I think that you could do a better job of keeping some of the equipment in our area clean. For example clean the #1 finish  mill compressor and jackshaft bearings daily instead of every once in a while. Take pride in your areas and make them look the best. Your attendance has some room for improvement as well.

3.  Neal accepted the position of Process Attendant in October of 2007 and has done a good job in that position for B-Crew. I think that with more time in that position his knowledge will continue to grow. Neal has expressed an intrest in the Mill Operators position and has been cross training in it.

**MM0063**
APP 027

## SUPERVISOR COMMENTS
### (Self Evaluation)

Answer the following three (3) questions in the space provided below or on a separate sheet and exchange with the subordinate before the review. If additional pages are used, please include your name and the date on each.

1.   The most positive aspects of my performance that helped this employee during the last 12 months were . . .

2.   The aspects of my performance that hindered this employee during the last 12 months were . . .

3.   Steps I can take which will best improve my performance and help this employee improve his/her performance in the next 12 months are . . .

1.   Neal during the past few months you have taken on a new job position and I have provided you with the training you need to perform that job. If you had any questions about your job or wasn't sure what to do about something I would make recommendations or suggestions that I thought would help you. I have made myself available to help you trouble shoot any problems you have during your learning process. I have encouraged you to work safely and to watch out for the safety of your team members. I provided you with our departmental safety meetings every month and give you the opportunity to participate.

2.   Neal with a plant the size of our plant it is hard sometimes to be everywhere there is trouble. I may not can always come and help you with a problem when you have one. In my position I have to prioritize the problems that I feel need my attention the most.

3.   Neal I will continue to answer any questions you have about your job and make suggestion that I think that will improve your performance. I will continue to encourage working safely and providing you with safety information that will help you to work safe. I will try to make myself more available to you and utilize my past experiences to help you when you need help.

## EMPLOYEE COMMENTS
### (Supervisor Performance)

Answer the following three (3) questions in the space provided below or on a separate sheet and exchange with supervisor before the review.  If additional pages are used, please include your name and the date on each.

1.     The most positive aspects of your performance that helped me during the last 12 months were . . .

2.     The aspects of your performance that hindered me during the last 12 months were . . .

3.     Steps you can take which will help improve my performance in the next 12 months are . . .

1.) Being A positive Leader, Lets employee do their job with out micro managment. Very good role model.

2.) Cross training Across the plant, New/Existing side. put on more responsibilities.

3.) Give me more responsibilities, cross train me to take over other employees job, in there Absents, ie Mill room miller #5 operator, #6 mill, Tower, RTO's And Kill Floor. Keep being A positive Leader.

**MM0065**
APP 029

## IMPROVING PERFORMANCE IS A TWO-WAY PROCESS . . . .

A.  Improving performance is necessary for continued Company success and growth.  The success and growth of TXI is measured in many ways (e.g. Assets/Equity, Stock Price, Price/Earning Ratio, etc.).  These statistics are a summary of all employees' performance and are evaluated by the owners (shareholders) of the Company, TXI's Board of Directors and financial institutions.  These outside-of-the-company evaluations concentrate on an analysis of the end results of accomplishments. They do not necessarily consider the way in which the results are obtained.

It is the policy of the Company that performance reviews take place annually during the month of the employee's <u>birth date</u>. Although there is a correlation between performance and salary increases, it is not intended that the performance review and salary recommendation be done at the same time.  It is better to separate the timing of the two so that discussions concerning performance, training and development, and career are not confused with discussions and/or issues involving the amount of a salary increase.  The primary purpose of a performance review is to aid in the identification, evaluation and development of an individual's performance.

### Supervisor / Employee Evaluation

Supervisor's are responsible for communicating this process to the employee.  The process is to be completed annually.  All three questions should be answered by both the Supervisor and the Employee.  Supervisor comments are noted on (Page 3) and Employee comments are noted on (Page 2).  After the form is completed by both parties, an exchange of written comments should take place.  An open, two-way discussion will take place to insure understanding by both parties. **Supervisors will ask the employee if review comments are to be included in the employee's personnel file.  Section B on Page 1 of this form is to be used for this purpose.**

### Supervisor / Employee Mutual Option

**Upside Down Review** - With an "upside down" review, the direction of the discussion is reversed giving the employee an opportunity to tell his/her supervisor how s/he helps/hinders the employee's effectiveness and how the supervisor could improve.  (Page 5 is used for this process).  Page 4 is used for the supervisor's self-evaluation.  It is the employee's option to participate in this type of review.  Feedback received using this  method **does not** need to be part of the submitted appraisal package unless the employee chooses to do so.

**Horizontal Reviews** - Horizontal reviews take place when the employee solicits feedback on his/her performance from peers, co-workers, team members, or customers.  Feedback is received in the same manner as with the employee's supervisor.  Employee's wishing to use this process should make copies of Page 3 and mail them to the appropriate individuals with a short note of explanation.  Feedback received using this method **does not** need to be a part of the submitted appraisal package unless the employee chooses to do so.

When employees use all of these combined methods, they have completed what is referred to as a **"360 degree"** evaluation process.  Feedback received from **multiple** sources is viewed by many as the optimal tool for enhancing performance, particularly when a company is trying to develop a more open, communicative culture.  When people receive honest, specific feedback from their supervisors, co-workers, team members and customers, they often come to understand how their behaviors affect others - and the need for change in some of those behaviors.

B.  A performance review for  *Neal Davis*  (Name/SSN)  was conducted on  6 / 9 / 07 .

S/he (does) (does not) want this review to be a part of his/her employee file.

An "upside down" performance discussion was conducted (yes) (no)

_____  Employee         KEYED        6 / 9 / 07
                                          JUN 1 5 2007
_____  Supervisor    JOHNNA JONES   6 / 9 / 07

MM0066
APP 030

Neal

## EMPLOYEE COMMENTS
### (Self Evaluation)

Answer the following three (3) questions in the space provided below and exchange with the supervisor conducting the review.  If additional pages are used, please include your name and the date on each.

1. What were the most positive aspects of my performance during the last 12 months?

2. What aspects of my performance during the last 12 months need improvement?

3. Which steps can I take which will best improve my performance in the next 12 months?

(1.) o- Always gave 100% when needed
o- stayed positive performing my duties
o- Strive for perfect Attendance
o- willing to learn more things / Quick learner,
o- Good Communication skills.

(2.) o- Improve on time management skills
o- Cut down on time House cleaning to enable me to cross train more

(3) o- Focus more on safety
o- Think things through before reacting to Job.
o- Manage time, to focus on other things And cross training

MM0067
APP 031

## SUPERVISOR COMMENTS
### (EMPLOYEE PERFORMANCE)

| EMPLOYEE NAME: Neal Davis | EVALUATOR NAME: Kelly Pitner |
|---|---|

Answer the following three (3) questions in the space provided below and exchange with the employee. If additional pages are used, please provide the date and employee's name on each.

1.    What were the positive aspects of this employee's performance during the last 12 months?

2.    What aspects of this employee's performance during the last 12 months need improvement?

3.    What training, education and/or experience does this employee need in order to meet current job expectations and/or to be prepared for future positions?

1.    Positive aspects- Neal you hired on at TXI in December of 2006 and have not been here for a complete year yet but here are some of your most positive aspects. I think that you have a good attitude towards your work; you seem to be very positive about any task you are assigned to.  When you were working in 712 tunnel I thought you did a good job of staying busy and done a good job of keeping the tunnel clean. You also had to keep a check on the bays to make sure they were feeding and you did. If you were needed to help in other areas of the plant you did with out complaining. I moved you to the mill room and you have been there for a few months now and you have continued to do a good job of keeping your areas cleaned. Since you have moved to the mill room you have trained in the mill oiler position some and you seem to get involved in any problem we are having in the mill room. You have made yourself available if needed to work different hours from your regular scheduled shift. Your personal safety record is good.

2.    Neal the since you hired on in December the only thing as of right now that I see that you could improve on is that in the short time you have been here you have been tardy to work twice. Here are some of my expectations that could help you to improve over the next twelve months. Keep the positive attitude you have and continue to work hard as you have been. Take task upon yourself without being told to do them. Always keep safety in mind at all times and watch out for the safety of your co-workers. If you are not sure of something or how to do something don't be afraid to ask questions.

3.    Neal has been a crewman for B-Crew since he hire on in December of 2006 and has done a good job as crewman. He has trained some at the Process Attendant (Existing Mills) and as he completes training in one area I will cross train him in another area.

MM0068
APP 032

PRESCREEN AMERICA
Neal Davis - XXX-XX-6907

| EMPLOYMENT 1 | | |
| --- | --- | --- |
| Employer | Washington Inventory<br>Not Provided | Status: Verified |
| Contact Information | Rick Perry<br>Listed Supervisor/Area Manager<br>817.589.9159 | |
| Date of Hire | Application: May 2006 | Report: May 2006 |
| Date of Separation | Application: September 2006 | Report: September 2006 |
| Position Held | Application: Inventory Clerk | Report: Inventory Clerk |
| Attendance | Performance | Rehire |
| 9 | 8 | Yes |
| **Comments:** Davis's past employment with Washington Inventory was verified. Perry verified the applicant's dates of employment and position held. Perry exclaimed, "Neal was a great employee because of his professionalism. I really felt, even though he was still in training, that he had a lot of potential and had no room for improvement. I would rate his attendance as nine and performance as ten. I would absolutely rehire him!" No further information was provided. | | |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NEAL DAVIS** | § | **Civil Action No. 3:16-cv-1312-L** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **MARTIN MARIETTA MATERIALS, INC.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **Defendant.** | § | |

<u>**DECLARATION OF EBENEZER PRAH**</u>

STATE OF TEXAS                              )
                                                       )
COUNTY OF __Tarrant_____    )

      BEFORE ME, the undersigned authority, on this day personally appeared Ebenezer Prah, who, being by me duly sworn, on oath stated:

      1.     My name is Ebenezer Prah.  I am over 18 years of age.  I am competent to make this Declaration.  I have personal knowledge of the facts stated herein and they are true and correct.

      2.     I am an American citizen born in Ghana.

      3.     I was employed by Martin Marietta Materials, Inc. as a process engineer from approximately October/November 2008 to March 2017.

      4.     I worked with Plaintiff, Neal Davis, at Martin Marietta Materials, Inc. during my whole time of employment.

      5.     My impression of Mr. Davis is that he is a hard worker that stayed late numerous days/nights to get his work done.

APP 034

6.     Mr. Davis also went to college at night so that he can get his Bachelor's degree in Human Resources, which he did. He worked hard and then attended school after a long day of work so that he could further his education.

7.     It was common at Martin Marietta to work overtime because last minute when people are about to leave or logged out for the day, they would have to come back to work to stay and get the work done.  Often, trucks would arrive late and Davis would have to stay and offload parts from the truck until completed.

8.     From my experience working with Mr. Davis, I never knew him to be late or to be regarded as a tardy employee.

9.     I also aware of a 7-minute window where if an employee came to work within 7 minutes of his/her work shift start time, the person was not counted tardy.  However, if the employee came in to work after the 7 minute mark, he/she was counted as tardy.

10.     Neal Davis would work late to complete whatever work tasks were required of him to ensure that the work was completed.

11.     After Mr. Davis got his Bachelor's Degree in Human Resources, he applied for a planner and HR position, which was a higher position than the one Davis held.  He was passed up both times.

12.     During my time at Martin Marietta, almost all supervisory positions at Martin Marietta were held by Caucasian employees.

13.     During my employment with Martin Marietta, there were no African-American employees in a planner/administrative manager (HR) position.

14.     During my employment with Martin Marietta, everyone in HR and the front office were all Caucasian employees.

APP 035

15.     While supervisors did not outright state that the reason someone was terminated, not selected, hired, promoted was because of their race, the attitude and actions of the supervisors and managers reflected the underlying racism at the workplace.

16.     Supervisors at Martin Marietta preferred having a lower education/experienced Caucasian employee in a managerial/HR/Planner position than a higher qualified minority.

17.     A good example of this institutional racism at Martin Marietta was failing to select Neal Davis twice for promotions he applied for.  Davis was clearly more qualified for the positions for which he applied (Planner and HR) than the Caucasian individuals who were eventually selected for the job.

18.     Based on information and belief, for the HR position that Mr. Davis applied for, Martin Marietta gave that position to Bridgette Hurst, an individual with less educational qualifications and experience than Davis.

19.     Based on information and belief, the worst example of Martin Marietta's systemic racism at the workplace was their decision to forego Mr. Davis for the Planner position.  After posting the position, Defendant did not make the decision for months.  Mr. Davis was clearly qualified for the position.  After months, they made up an excuse of tardiness to terminate Mr. Davis.  They took his alleged tardies from years prior to say that they were going to fire him out of the blue.  After they terminated him, they selected Leann Kirkpatrick for the Planner position.

20.     Based on information and belief, Leann Kirkpatrick did not have a degree and was a secretary before she held the Planner position.

21.     Based on information and belief, Martin Marietta fired Davis for asking about the Planner position for which he applied.  Martin Marietta did not have a reason to hire Leann Kirkpatrick based on qualifications when compared to Davis.  So, per their practice, they made

APP 036

up an excuse of alleged tardiness (from years back) to terminate him after ten years of service to Martin Marietta.

22.     While almost all supervisors/managers/HR/administrative positions are held by Caucasian employees, there are African Americans in lower positions.  I was terminated after 8 years of working for Martin Marietta by my supervisor, Alan, because he said we were not "compatible."

23.     Another African American employee, Aaron Toles, an engineer, told me that he was resigning because the environment at Martin Marietta was not conducive to his career growth.

24.     Based on experience, information, and belief, Martin Marietta makes it a point to terminate people of color and retain Caucasian employees.

25.     After Davis was wrongfully terminated, Martin Marietta promoted a temporary employee in the warehouse to Davis' position.  The temporary employee was a Caucasian individual.

## **VERIFICATION**

| | |
|---|---|
| STATE OF TEXAS | ) |
| | ) |
| COUNTY OF DALLAS | ) |

"My name is Ebenezer Prah, my date of birth is October 12, 1957, and my address is 3148 North Camino Lagos, Grand Prairie, TX 75054, Tarrant County, USA.  I declare under penalty of perjury that the foregoing document titled Declaration of Ebenezer Prah is true and correct.

Executed in Dallas County, State of Texas on the ___16___ day of October, 2020.

_____
Ebenezer Prah, Declarant"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NEAL DAVIS** | § | **Civil Action No. 3:16-cv-1312-L** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **MARTIN MARIETTA MATERIALS, INC.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **Defendant.** | § | |

<u>**DECLARATION OF FREDERICK YZQUIERDO**</u>

STATE OF TEXAS                              )
                                                          )
COUNTY OF __Dallas_____              )

BEFORE ME, the undersigned authority, on this day personally appeared Frederick Yzquierdo, who, being by me duly sworn, on oath stated:

1.      My name is Frederick Yzquierdo.  I am over 18 years of age.  I am competent to make this Declaration.  I have personal knowledge of the facts stated herein and they are true and correct.

2.      I was employed by Texas Industries, Inc., which later became Martin Marietta Materials, Inc.  Anytime I use the term Martin Marietta Materials, Inc. herein, I am doing so to avoid confusion, but am referring to the same plant with same employees, which went by Texas Industries, Inc.

3.      I was hired to work at Martin Marietta through a temporary agency and worked there for approximately 6-8 months.

4.      I worked in the store room/warehouse moving inventory and putting up parts in the Midlothian plant.

APP 038

5.      I worked with Plaintiff, Neal Davis, at Martin Marietta Materials, Inc. during my whole time of employment.

6.      My impression of Mr. Davis is that he is a good, honest man and employee that worked hard for Martin Marietta.  Mr. Davis on several occasions stayed late to get work done and worked through his lunch break to perform work for Martin Marietta.

7.      Mr. Davis went above and beyond his job duties while working for Marin Marietta.

8.      Mr. Davis also went to college at night so that he can get his Bachelor's degree in Human Resources, which he did.

9.      From my experience working with Mr. Davis, I never knew him to be late or to be regarded as a tardy employee.

10.      I also was aware of a 7-minute window where if an employee came to work within 7 minutes of his/her work shift start time, the person was not counted tardy.  However, if the employee came in to work after the 7 minute mark, he/she was counted as tardy.

11.      Based on my work experience at Martin Marietta, I heard many employees complain about the company as disorganized.  My impression of Martin Marietta's operations is also that the supervisors were disorganized and overlooked safety issues at the plant.

12.      Neal Davis would work late to complete whatever work tasks were required of him to ensure that the work was completed.

13.      After Mr. Davis got his Bachelor's Degree in Human Resources, he applied for a planner and HR position, which was a higher position than the one Davis held.  He was passed up both times.

APP 039

14.     During my time at Martin Marietta, almost all supervisory positions at Martin Marietta were held by Caucasian employees.

15.     The following supervisors/mangers/administration were Caucasian, who represent the majority of the employees at Midlothian plant for Martin Marietta:

    a.  Randy Walser, Plant Manager

    b.  Jason Crowther, Assistant Plant Manager

    c.  LeAnn Kirkpatrick, Administrative Assistant II

    d.  Hal Lasater, Plant Engineer

    e.  Ricky Poff, Utility Supervisor

    f.  Glen Alexander, Maintenance Planner

    g.  John McCutchen, Maintenance Planner

    h.  Paul Hanks, Electrical Supervisor

    i.  Dan Kugler, Maintenance Plant Supervisor

    j.  Danny Thursby, Maintenance Plant Supervisor

    k.  Ryan Moyer, Division Procurement Manager

    l.  Terry Doyle, Regional HR Manager

    m.  Mickey Blankenship, Production Manager

    n.  Bobby Harris, Process Supervisor

16.     During my employment with Martin Marietta, there were African American employees in a supervisor/manager/administration/planner position.

17.     During my employment with Martin Marietta, everyone in HR and the front office were all Caucasian employees.

APP 040

## <u>VERIFICATION</u>

STATE OF TEXAS                                      )
                                                   )
COUNTY OF DALLAS                                   )

"My name is Frederick Yzquierdo, my date of birth is March 7, 1969, and my address is 2829 Coral Drive, Lancaster, TX 75146, Dallas County, USA.  I declare under penalty of perjury that the foregoing document titled Declaration of Frederick Yzquierdo is true and correct.

Executed in Dallas County, State of Texas on the ____16^{th}____ day of October, 2020.


_____
Frederick Yzquierdo, Declarant"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NEAL DAVIS** | § | **Civil Action No. 3:16-cv-1312-L** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **MARTIN MARIETTA MATERIALS, INC.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **Defendant.** | § | |

**AFFIDAVIT OF NEAL DAVIS**

| | |
|---|---|
| STATE OF TEXAS | ) |
| | ) |
| COUNTY OF DALLAS | ) |

BEFORE ME, the undersigned authority, on this day personally appeared Neal Davis, who, being by me duly sworn, on oath stated:

1.      My name is Neal Davis.  I am over the age of 18.  I am competent to make this Affidavit.  I have personal knowledge of the facts stated herein and they are true and correct.

2.      I am African-American.

3.      I served the United States of America for almost twenty (20) years as a Sergeant First Class in the United States Army, and was honorably discharged.

4.      I spent over 8 years as a Recruiter and over 12 years as an Infantryman earning the Meritorious Service Medal, Army Commendation Medal, Army Achievement Medal, Army Good Conduct Medal, National Defense Service Medal, and Global War on Terrorism Medal, among many other awards and honors.

5.      I was employed by Defendant, Martin Marietta Materials, Inc. from approximately December 11, 2006 through January 22, 2016 as a Utility Crewmember making

$24,600.00, and then eventually a Storeroom Attendant making $36,816.00 when I was ultimately terminated.

6.      During the course of my employment, I was given compliments and laudatory comments from my supervisor and other supervisors, including Eric Wilson, Danny Thursby, Mickey Blankenship, and Lucy Tovar.

7.      However, despite my work for Martin Marietta for approximately ten years, I was never promoted after applying for two higher level positions (HR/Administrative Manager and Planner), for which I was qualified.  I was more qualified than the Caucasian employees that were hired instead of me for those positions.

8.      While employed by Martin Marietta, I ordered parts in the storeroom, maintained and ordered inventory, kept parts list, tool lists, ensured proper storage and ensured inventory was on hand when needed.

9.      The Planner position for which I applied was a higher level Store Attendant II position in management, which included job duties such as ensuring that inventory was on hand when needed, ordering inventory, calling lenders, provide parts lists, develop tool lists, determine cost of parts for each work order, order non-stock parts, ensure proper storage of parts, and maintaining/monitoring inventory.

10.     I obtained a Bachelor's degree in Human Resources, which I earned at night while working at Martin Marietta full-time.

11.     I have experience in the United States Army as a Recruiter for eight (8) years from June 1996 to September 2004.  I have experience through the Army as a planner, as well.  I was in charge of exercises and long-term and short-term development planning for the soldiers I supervised.  I have supervisory and leadership experience in the Army, as well.

12.     I also have ten (10) years of experience at Martin Marietta.  During my tenure at Martin Marietta, I was ordering parts in the storeroom and following up with contacts/order, which is similar to the skills for the Planner position.

13.     As a Storeroom Attendant, my job duties included organizing inventory, shipping, ordering and updating inventory, housekeeping, lockout and cross training with Storeroom Attendant II, and Storeroom Assistant.

14.     The Planner position included job duties such as ensuring that inventory was on hand when needed, ordering inventory, calling lenders, provide parts lists, develop tool lists, determine cost of parts for each work order, order non-stock parts, ensure proper storage of parts, and maintaining/monitoring inventory.

15.     In June 2015, I applied for a Planner position at Martin Marietta, for which I was qualified.

16.     When I followed-up with Hurst about the Planner position (as Martin Marietta did not make a decision for months), Hurst told me that if I wanted to be promoted to a management position, I should leave Martin Marietta altogether.

17.     Almost all of the supervisory and/or managerial positions at Martin Marietta are held by Caucasian employees.  Attached to this Affidavit is a document title Midlothian Cement, which I received from Defendant through its discovery production.  The document shows an Organizational Chart for the employees that worked at the Midlothian plant for Defendant.  I instructed my attorney to record the race for each individual on this document.  Exhibit A-1 reflects an accurate representation of the race of the employees provided in the organization chart based on information and belief.

18.   I was not selected; rather, a Caucasian female employee named LeAnn Kirkpatrick was selected.

19.   To the best of my knowledge and understanding, Kirkpatrick had absolutely no relevant education and started her tenure with Martin Marietta in 2014.

20.   Kirkpatrick did not take over for Glen Alexander's position while he was on extended medical leave.  Rather, Eric Wilson and I performed some of those Planner duties while he was on leave.  Then, I would turn in work to John McCutchen, not Leann Kirkpatrick because she was not performing that job.

21.   At that time I applied for the job of Planner, I had earned a Bachelor's Degree in Human Resources, had 10 years with Martin Marietta, and twenty (20) years of experience with the United States Army, with relevant skills that would be useful and necessary in the Planner position.

22.   In November 2015, I applied for a Human Resources (Administrative Manager) position, for which I was qualified in light of 8 years as a Recruiter and my Bachelor's Degree in Human Resources, as well as my ten (10) years at Martin Marietta.

23.   I was not selected for the Human Resources (Administrative Manager) position; rather, a Caucasian female employee was selected named Bridgette Hurst.

24.   The Administrative Manager position was essentially very similar to a Recruiter position, for which I had ample experience.

25.   To my knowledge and understanding, Ms. Hurst had an Associate's Degree in Office Administration.

26.   I spoke with Karen McDonald (a Caucasian employee) who was the temporary HR manager at Martin Marietta.  McDonald admitted to me that she did not know how I could

have been overlooked for the HR position because I had vastly more experience and education than the Caucasian employee (Hurst) that received the position.

27.     Two Caucasian male team leads (one named Clint Gilley) told me that only females get the HR jobs at Martin Marietta's plant, and that was why I did not get the HR position.

28.     Lucy Tovar, a manager, falsely attempted to write me up for tardiness in 2013, but I contested the write-up, and it was changed to a verbal warning, which I also did not agree with because she did not follow Martin Marietta's own policies.

29.     I was not written up for tardiness or verbally warned about being tardy in 2014, 2015 or 2016.

30.     Nevertheless, I was told in 2016 that my termination was based on tardiness from years prior.  I was not placed on any performance improvement plans or given any warnings prior to this termination.

31.     All my annual performance reviews either indicate that my attendance and punctuality were completely acceptable or was not worth mentioning.

32.     On the very date that I was terminated, January 22, 2016, Ms. Kirkpatrick was given the job of Planner.  I learned of her promotion from Ms. Kirkpatrick after asking her why people were congratulating her at the office.  She said was given the Planner position.

33.     After speaking to Kirkpatrick, Bridgette Hurst asked me to come into her office to meet with her.  She brought Wilson into the meeting, as well.  Hurst told Wilson to read a letter she gave him to me.  Wilson started reading the letter and stopped to ask her what the letter was and why he was being made to read it. He said that it was not right.  Hurst told him to keep reading the letter.

34.     Wilson read the letter to me, which was my termination letter.  The reason given for my termination was supposed tardies I had between 1/22/2015 and 1/15/2016.

35.     My supervisor, Eric Wilson, called to tell me that the reason I was terminated was due to the fact that I had indicated that I should have received the Planner position instead of Ms. Kirkpatrick.  Wilson told me that he did not want to terminate me but was forced to by Defendant.

36.     Ms. Kirkpatrick did not perform the Planner job duties during Glen Alexander's extended medical leave.  Rather, Eric Wilson and I took over several job duties, including but not limited to requisition, ordering parts, and reporting the requisitions to John McCutchen.  If Kirkpatrick took over the Planner position duties during Alexander's extended medical leave, I would have reported the requisitions to her, which I did not.

37.     I was told by Tovar and Wilson at Martin Marietta that I should not clock back in if I was called back after clocking out.  I was told this because the system automatically grants a person who clocks back in four hours, which Martin Marietta did not want me to record.

38.     I typically worked 3 hours after logging out, which was never recorded per Wilson and Tovar's instruction.

39.     I told Eric Wilson that I was working extra hours per his instruction, without getting paid.

40.     Eric Wilson never instructed me or instructed HR on my behalf to adjust my hours on the Payroll Adjustment Form.

41.     Wilson did not suggest using the Payroll Adjustment Form to make changes after he instructed me not to log back in to record my hours worked after logging out.

42.     Based on my knowledge, experience, and practice with Martin Marietta, the Payroll Adjustment Form was used for major changes to pay, such as changing vacation to illness, not for minor pay changes.

43.     I asked Eric Wilson on multiple occasions to make adjustments to my schedule in light of these overtime hours that I was not compensated for, but I never received the relevant adjustments.

44.     At the onboard meeting with Martin Marietta's corporate HR, I was told that a seven minute rule existed for tardiness, which means that if I clocked in within seven (7) minutes of my start time it would not be counted as a tardy.

45.     I did not have a habit of being tardy according to Martin Marietta's own policy.

46.     Almost all tardies I had fell within the 7 minute window and did not count as a tardy.

47.     I was not informed that my alleged tardies were cause for write-ups, performance issues, or termination until the date of my actual termination.

48.     Martin Marietta typically gives a verbal warning before a written warning, which was not even followed for the alleged tardies Martin Marietta accused me of having.

49.     I worked substantial overtime at Martin Marietta.

50.     I worked overtime after logging out of the time system that was not recorded because Defendant told me not to log back in because the system would give me an automatic 4 hours of overtime.

51.     After logging out, I typically worked a minimum of 2 hours, with an average of 3 hours a day for which I did not receive pay.

**THIS IS AFFIANT'S COMPLETE STATEMENT**



Neal Davis

**SUBSCRIBED AND SWORN TO BEFORE ME** this 15th day of October, 2020 to certify which witness my hand and seal of office.

*Michael Jerome Andino Jr.*

Notary Public in and for the State of Texas

My Commission Expires:

04 - 08 - 2024

MICHAEL JEROME ANDINO JR.
Notary Public, State of Texas
Comm. Expires 04-08-2024
Notary ID 132431466

# MIDLOTHIAN CEMENT

**Randy Walser**
Plant Manager
*Caucasian*

**Jason Crowther**
Assistant Plant Manager
*Caucasian*

**Kelly Pitner**
Distribution Supervisor
*Caucasian*

**Bridgette Hurst**
Admin. Services Supervisor
*Caucasian*

**Mickey Blankenship**
Production Manager
*Caucasian*

**Hall Lasater**
Plant Engineer
*Caucasian*

**Ricky Poff**
Utility Supervisor
*Caucasian*

**Glen Alexander**
Maintenance Planner
*Caucasian*

**John McCutchen**
Maintenance Planner
*Caucasian*

**Aaron Toles**
Reliability Engineer
*African American*

**Paul Hanks**
Electrical Supervisor
*Caucasian*

**Dan Kugler**
Maintenance Plant Supervisor
*Caucasian*

**Danny Thursby**
Maintenance Plant Supervisor
*Caucasian*

**Eric Wilson**
Storeroom Supervisor
*Caucasian*

**LeAnn Kirkpatrick**
Administrative Assistant II
*Caucasian*

**Matt Bridges**
Buyer
*Caucasian*

**\*Ryan Moyer Cement**
Division Procurement Manager
*Caucasian*

**\*Kerri Kerr**
Manager / Environmental Services, Cement Division
*Caucasian*

**Jeff Wendell**
QC Manager
*Caucasian*

**Todd Camp**
QA Supervisor
*Caucasian*

**Debbie Theisen**
Administrative Assistant II
*Caucasian*

Service Group

**\*Dan Paine**
Safety Representative
*Caucasian*

**\*Laura Bell**
Finance Manager
*Caucasian*

**Karen McDonald**
Requisition Analyst
*Caucasian*

**Suzanne Marucci**
Sales Audit Administrator
*Caucasian*

**\*Terry Doyle**
Regional HR Manager
*Caucasian*

**Ebenezer Prah**
Sr. Process Engineer
*African*

**David McGraw**
Production Supervisor
*Caucasian*

**JW Williams**
Process Supervisor
*Caucasian*

**JR Hernandez**
Relief Specialist
*Hispanic*

**Bobby Harris**
Process Supervisor
*Caucasian*

**Chad Price**
Process Supervisor
*Caucasian*

**Danny Ridings**
Process Supervisor
*Caucasian*

\*Dotted line to Plant Manager



**Interoffice Memorandum**

**Date:  January 25, 2016**

**To: All Employees**

**From:  Jason Crowther**

**Subject:  LeAnn Kirkpatrick Promotion**

Please join me in congratulating LeAnn Kirkpatrick in her new position as **Maintenance Planner.**

LeAnn started at the Midlothian Plant in April of 2014 as the Maintenance Admin. Since then, she has shown what an asset she can be to the maintenance department and the plant. I know that she will do the same in this position as well. I look forward to seeing her continued success with Martin Marietta.

Congratulations LeAnn and good luck!!

JC/bh



# Maintenance Planner

Location: Midlothian, TX   76065
Recruiter: Bridgette Hurst
Hiring Manager: Jason Crowther

**PURPOSE**

The primary objective of the Maintenance Planner is to improve the efficiency and productivity of the workforce, service companies, and contractors. This will be accomplished by providing the employees with detailed job plans, including technical specifications, machinery history, parts and tools lists, and safety procedures in a very organized fashion. The Maintenance Planner is also responsible for providing all the necessary information to ensure that all work is completed in a safe, efficient, and timely manner, and in compliance with environmental requirements.

**ROLES AND RESPONSIBILITIES**

The Maintenance Planner is responsible for the preparation of all planned maintenance activities to be executed by Midlothian Cement employees, service companies, or contractors. In that role, the Planner will work closely with the Maintenance Staff team on the following tasks and responsibilities in order to reinforce the day-to-day preparation and job planning:

· Improve the content and quality of information on work orders
· Add pertinent information to the Work Package as required helping ensure the comprehension of the package material by the execution team
· Clearly define the scope of work to be performed
· Establish the preparatory work required prior to scheduled equipment downtime
· Develop a detailed job plan with all the work sequences involved to adequately complete the repairs, as well as equipment downtime and work-hours required
· Determine and document in a list all the safety procedures associated with the work to be performed
· Develop a tool list specific to the job to be performed
· Provide a parts list with reference numbers and exact location for every work order and ensure that all required parts are in stock before job scheduling
· Ensure all technical specifications and special instructions are provided on paper to the supervisor and team
· Determine the cost involved for parts and supplies for each work order
· Ensure that once a job is completed, the work order (WO) is filled out properly and that meaningful information is entered into the machinery history file
· Order all non-stock parts and materials as required by the job procedure
· Inform the Mechanical Supervisor when a job is ready for scheduling
· Establish and maintain, with the supervisors and the Warehouse a system for proper storage of pre-work and parts for pending work
· Work with the Warehouse Supervisor to review and update parts min-max levels and to develop and maintain the equipment parts catalogue
· Responsible for the process improvement and maintenance of the equipment files and history (paper and electronic)
· Review all existing master job procedures on a regular basis and ensure that they are up to date and contain all pertinent information
· Ensure that the inventory and sources of spare parts are consistent with standards, plant equipment reliability, and economic constraints. S/He will also ensure materials and parts conformity upon receipt

- Must be a subject matter expert of JD Edwards. The Planner must have full functional knowledge of the work order tracking system, spare parts catalogue, procurement punch out, requisitioning, and inventory systems as well as knowledge of the modern software packages available such as Word, Excel, Microsoft Project Scheduler, etc.
- Assist the Maintenance Manager and Reliability Engineer with the preparation and control of the annual budget
- Participate in the Maintenance Supervisor On-Call Program
- Participate in the daily work order review and weekly scheduling meeting.
- Participate in the development of the major maintenance jobs
- Keep the Bill of Materials up to date for all equipment
- Maintain the drawing office and technical library including catalogue of documents, manuals and drawings

**SPECIFIC ACCOUNTABILITIES**

- Develop procedures for every WO by providing the employees with detailed job plans, including technical specifications, drawings, relevant information from the manuals, machinery history, parts and tools lists, and safety procedures in a very organized fashion.
- Provide parts list with stock numbers and exact location for every work order and ensure that all required parts are in stock before job scheduling
- Arrange the purchase of non-stock parts for the completion of jobs as well as be aware of the available stock parts. Maintain current the Equipment Parts Catalogue on each piece of existing equipment and develop parts lists for new equipment installations
- Write job scopes and bid documents [Request for proposal (RFP)] for contract services, and represent Maintenance in the bid process along with Procurement and other personnel
- Improve and maintain the equipment files and history (paper and electronic)
- Plan all major turnarounds of all equipment throughout the year
- Assist the Maintenance Manager and Reliability Engineer in the development of the yearly department budget and control of it once approved
- Lead in the utilization of JD Edwards and Scheduling software in accordance with best practices

**QUALIFICATIONS**

- Bachelor's degree in a related field strongly preferred. Technical/vocational/ trade school and/or significant experience in the cement industry will be considered in lieu of degree with demonstrated skills in the use of computers and other aspects relevant to this position. A degree is preferred, but not a requirement.

**Technical Skills**

1. Global
- Local Safety regulations and procedures
- Cement production process
- Equipment technology
- Strong computer knowledge in JD Edwards, Microsoft Projects, Excel and PowerPoint
- Possess the ability to learn through formal training and work related experiences
2. Mechanical
- Cement and/or Heavy industry parts experience
- Knowledge of mechanical repairs and procedures for all cement equipment
- Knowledge of Root Cause Failure Analysis
- Knowledge of Computer Aided Design [AutoCAD]
3. Personal Skills
- Results driven (reliability, cost)
- Ability to plan or arrange work on a continual basis including break-ins and emergencies

- Ability to prioritize work orders and manage priorities
- Ability to interact with plant personnel at all levels
- Good interpersonal skills
- Strong communication skills, both oral and written
- Willingness to work extended hours, even weekends and holidays, if required
- Ability to strategize in ambiguous situations
- Strong computer skills such as fluency in the use of CMMS, Microsoft Word, Excel, PowerPoint, Project, etc.
- Ability to successfully negotiate with vendors

**PHYSICAL REQUIREMENTS**

- Ability to sit for extended periods of time (up to 8 hrs.), stand, stoop, and bend
- Walk on all types of surfaces (uneven and/or slippery ground)
- Climb stairs and ladders as high as 200 feet in elevation
- Physical ability to climb on equipment to provide supervision as needed
- Able to walk long distances, climb ladders, stairs and stockpiles, stoop and crawl under and into enclosed spaces
- Must be able to clearly see and hear safety indicators and warnings
- Must work in all weather conditions, heat, cold, wet, dry, and/or dusty conditions, and near hot kiln process
- Tolerate exposure to all levels of noise that will require the use of hearing protection
- Tolerate potential exposure to cement, clay, limestone, various lab chemicals, and fuels. See MSDSs for more details.

**Equal Opportunity Employer/Minorities/Females/Veterans/Disabled**



# MIDLOTHIAN CEMENT

245 Ward Road • Midlothian, TX 76065-9645 • 972.647.4985   Fax 972.647.4907

*txi.com*

April 11, 2014

LeAnn Kirkpatrick
104 Minnie Dr.
Itasca, TX 76055

Dear LeAnn,

I am very pleased to confirm TXI's offer of employment.  We are looking forward to the significant contribution you will make to the continued success of our Company.

The Company is offering you the position of **Admin Support II** for our Midlothian Cement Plant.  Your base salary will be **$17.31** per hour ($36,000 annual).  You will participate in the Midlothian Cement Production Incentive Plan, and your participation in this incentive plan for FY'14 will be prorated based upon your actual eligible earnings during the plan year.  I will explain the details of the incentive plan as part of your orientation process.

If you accept the position, your effective date of employment will be on a mutually agreed upon date on or before April 28, 2014. You will be eligible for TXI benefits including medical, dental and life insurance coverage on your first day of employment. Participation in our 401k Retirement Plan will begin automatically after 90 days.

You will be eligible for 1 week of vacation beginning 1 year after your start date and each January thereafter.  I will explain the vacation allowance schedule and how your vacation allotment will increase with tenure.

This offer is for "at-will" employment and is not an employment contract, and no provision of this offer should be considered as such. This offer is contingent upon successful completion (negative test result) of a pre-employment drug screen urinalysis and physical exam confirming your ability to complete the essential functions of the job.

Additionally, this offer is contingent upon a satisfactory background verification and criminal history screening.  We will also investigate your driving record to confirm your eligibility to drive on Company business.

If you accept our offer, you will be required to provide suitable documentation verifying your identity and work eligibility as required by the Immigration and Reform Control Act of 1986. Please bring this documentation with you on your first day of employment (examples: Social Security card and Driver's License or Passport).

Please also bring a voided check with you so that you can enroll immediately in our direct deposit pay program.

**We will provide exceptional building materials,
service and solutions so that customers choose TXI.**

Upon acceptance of this offer of employment, please sign and return the original letter to me.  If you need to reach me for any reason, you can contact me in my office at 972-647-4950, or on my mobile phone at 972-898-7822.

Congratulations, we look forward to welcoming you to the TXI Midlothian Team!

Sincerely,


Scott Hoard                              Accepted: _____
Maintenance Manager                              LeAnn Kirkpatrick



Karen McDonald
972-647-4949
kmcdonald@txi.com

# Resume for Amy Kirkpatrick

Candidate Phone: 8172196134 | Secondary Phone: 8172196134 |
Email: leannkirkpatrick@sbcglobal.net

LeAnn Kirkpatrick

104 Minnie Dr. Itasca, TX 76055
Cell: 817-219-6134
leannkirkpatrick@sbcglobal.net

Professional Overview

Detail-oriented and organized office administrator with experience in fast-paced
business settings.

Summary of Skills

Extensive customer service experience
Expeditious learner
Critical thinker
Detail-oriented and highly organized
Ability to succeed in diverse environments
Extensive Microsoft office software, including Excel, Word, Access, Publisher
QuickBooks software experience
TRUX software experience
Travel arrangement experience
Account management experience


Focus on efficiency often evaluating current procedures and protocols for
improvement
DOT Compliance experience
Dispatch experience/Broker experience
Monthly Reports, P&L, Budget, etc.

**MM0378**
APP 057

General office equipment function and general maintenance
Excellent multi-tasking ability
Enthusiastic office leader
Spreadsheet creation, entry and formulation
Extensive AP/AR experience

Work Experience

Scale Operator
2013-Present
Itasca Landfill
Weigh in trucks via TRUX7 software. Customer service includes but not limited to ensuring proper disposal of waste streams, extensive data entry into Excel spreadsheets, multiple phone lines, ensuring accurate tonnage via Excel reports and multiple administrative tasks for daily operations. General office functions include but not limited to filing, copying, email, scans, etc.

Freight Broker/Dispatcher
2011-2013
B&D Steel Services
Brokered freight loads for extensive steel customer database. Company had established customer database in which I was responsible for continuance of customer satisfaction. Relationship with customers met and exceeded required demands. Extensive bookkeeping and multiple load pay systems was a strong demand completed to owner's requirements. I created and maintained many extensive spreadsheets and reports for owners. In this position I was able to positively enhance the work flow, environment, and quality of relationship between drivers and customers.

Substitute Teacher
2009-2011
Itasca ISD
Substitute teacher in the absence of teacher.

Lead Scale Operator
2008-2009
Itasca Landfill
Supported all regulations set forth on weight and product entering the landfill. I was responsible for ensuring all vehicles entering landfill were in compliance. Systematically improved the efficiency and organization of Special Waste Profiles and obedience according to them of all scale operators. Served as the Supervisor of the Scale House in the absence of the Office Manager. Extensive data entry into TRUX system including evaluation for ease of use. Improved communication as primary liaison between scale operators, management, customer service and

MM0379
APP 058

multiple departments. Operated general office equipment and general repair.
Special Waste Assistant
Reviewed all Special Waste Profiles submitted for acceptance of disposal at the
facility. Extensive and tedious detail review to ensure the TCEQ guidelines were
met. I was responsible for communication with management and sales department
when an error occurred. In the event of an error, communication was necessary with
the customer in which I handled proficiently. Ensure all disposal loads have required
information for disposal in a filing system available for quick review upon entering
scale.


Office Supervisor
2003-2006, 2007-2008
Seventh Transport, Inc.
I began this job as a receptionist to assist the Office Supervisor with answering high
volume phone lines and data entry. Within one year I was promoted to Office
Supervisor. Managed the office for a terminal that consisted of 25+ daily route
drivers, 6+ over-the-road drivers, maintenance and office personnel. Dispatched
OTR drivers while brokering loads hourly or daily. Assisted all issues and
paperwork for the daily work of the dedicated route drivers with Terminal Manager.
I was responsible for all customer service, A/P, A/R, payroll for all employees, DOT
Compliance, petty cash, extensive data entry, creation of spreadsheets and many
other general functions. Completed all driver orientations and interviews for Human
Resources. Managed all budgets by means of financial reports. Financial reports
required meticulous detail to expenses, profits, A/P, A/R, payroll and many other
factors which were input in reports for corporate office. Financial reports I
administered include, but are not limited to, Tonnage Report, Flash Report,
Weekly/Monthly/Yearly Budget Report and Profit & Loss. Planned and executed
many organizational record keeping, time reductions, efficiency provisions and an
overall efficient system for operation of the terminal. All tasks were not scheduled
and required awareness and ability to handle in stressful situations, I succeeded in
this multiple times.

Office Manager, Self-Employed
2002-2003
Mrs. Baird's
Successfully administered all A/P, A/R, invoicing for all customers of spouse's
delivery route. High volume deposits and withdrawal were administered daily.
Created and administered all financial reports and monthly/quarterly/yearly income
tax filings. Customer service is something I was able to utilize in the growth of the
business. Any task required, whether scheduled or unplanned, required my
awareness and ability to multi-task.

Store Clerk
1998-2002
Jimmy's Corner Store

MM0380
APP 059

Welcomed customers sales, greeted customers, cash register clerk, stocked coolers, and general convenient store functions.

Receptionist
1999-2001
U.S. Copper
Answered high volume phone lines, greeted customers, reviewed all prospective applications and recordkeeping. I handled any additional requests for assistance in any department necessary.

Shipping/Receiving Clerk
Ensured accuracy and inspection of all BOL's, Packing Lists, and required paperwork to match the materials leaving the terminal. Dispatched carriers for pickup and delivery. Assisted customers with any questions regarding shipping or receiving.

Extracurricular/Volunteer/Non-profit Activities

Itasca Youth Association - VP, Secretary, Treasurer, Activity Coordinator
Amateur Sports
Church involvement
Extensive Community Involvement

References

Rebecca Hanes
817-933-2390
Friend, Co-worker at Seventh transport, Inc.

Jim Beottcher
817-999-0781
Co-worker at Seventh Transport, Inc.

Mandy Fedor
817-975-3687
Life long friend

Nancy Edwards
682-459-5547
Friend, Co-worker at B&D Steel Services

Kim Upchurch
254-366-1699

MM0381
APP 060

Friend

Community service, church, and volunteer references are available upon request.

MM0382
APP 061

## Candidate Cover Letter / Comments

To Whom It May Concern:
I am a dedicated and expeditious learner. I enjoy exploring new ventures and acquiring knowledge. Detail oriented, focused and outgoing are a few of the traits I will be able to enhance your establishment on a positive basis. I take pride in my work and assure all employers will be satisfied with the performance brought forth. Please inform me of any questions or concerns you may have at any time. I am available to answer phone calls until 2 pm, as right now I work 2PM to 10:30PM. I am currently looking to change to day shift position. Please contact me via cell at 817-219-6134 or email leannkirkpatrick@sbcglobal.net.

Thank you for your consideration.
LeAnn Kirkpatrick

**Bridgette Hurst**

**Subject:** FW: Job description

**Administrative Manager**

Martin Marietta - Cement - Midlothian, TX

Commission

Apply with your Indeed Resume

We're building our future with you.

*Martin Marietta, an American-based company and a member of the S&P 500 Index, is a leading supplier of aggregates and heavy building materials, with operations spanning 32 states, Canada and the Caribbean. Dedicated teams at Martin Marietta supply the resources for the roads, sidewalks and foundations on which we live.*

*Martin Marietta's Magnesia Specialties business provides a full range of magnesium oxide, magnesium hydroxide and dolomitic lime products.*

*At Martin Marietta, we are always looking for the best and the brightest, for people who have the potential to be the Company's future leaders. We are building on our foundation of success by selecting the finest people and helping them realize their potential. When you decide to build your career at Martin Marietta, you'll know what it's like to be respected, challenged and rewarded.*

**POSITION SUMMARY**

The Administrative Manager is responsible for providing on-site, first level HR and employee relations support to the plant. This position also manages assigned administrative staff and oversees custodial services. This position reports to the Plant Manager with a strong dotted line reporting relationship to the Director of Human Resources.

**ESSENTIAL FUNCTIONS**

- Works closely with HR Director on employment, compensation, disciplinary and other HR related matters

- Maintains desired plant staffing by coordinating plant recruiting efforts, advertising, sourcing, selection and pre-employment processing of applicants

- Coordinates and documents good faith outreach efforts in support of Affirmative Action and EEO efforts

- Ensures that BirdDog recruiting system is fully utilized to comply with requirements for accurate applicant tracking

- Supervises and coordinates onboarding process including timely i-9 completion and all associated new hire paperwork and training

- Works with plant management and HR and Safety to assess ongoing training needs; secures and/ or develops and/or facilitates training programs to address same

- Accesses JDE HR/PAYROLL system to generate, process and key ECNs for hourly employees

- Generates ECNs for salaried employees and prepares them for keying at Corporate

- Generates various reports from the HR/Payroll system

- Maintains current HR knowledge by attending educational workshops and other training opportunities, reviewing professional publications and networking with other HR professionals

1

- Actively engages with employees to assesses morale, and assist with problems solving related to their employment or benefits escalates issues to involve HR Director as needed

- Champions of positive employee relations in all phases of the operation

- Maintains employment files in audit read condition

- Coordinates employee communications for the plant

- Coordinates and documents strategic community relations efforts; Participates and encourages other employees at all levels to participate in such activities; Coordinates efforts with Martin Marietta Communications and Governmental Affairs

- Supervises and coordinates the random drug and alcohol screening program

- Provides support for corporate and plant safety programs and initiatives

- Serves on leadership team for Annual Refresher Training and may serve in outside safety leadership roles (MSHA conference committees, Holmes, etc)

- Administers gift card program and other employee recognition programs, i.e.- service awards, safety slogans, plant incentive plans, etc.

- Administers local aspects of Educational Assistance Program

- Oversees various HR and Administrative projects tied to the Management Incentive Program

- Ensures custodial services are performed with appropriate quality; facilities should be clean and presentable at all times

- Staff support for Plant Manager and management team

- Assists with projects, analyses, reports, and communications as needed

- Leads admin team in coordination of major events including BOD visits, tours, employee picnic, Christmas party, etc.

- Kronos Administrator, assists employees with payroll issues as needed

- Notary Public

- Other duties as directed by management

**MINIMUM EDUCATION AND EXPERIENCE**

- Bachelor's degree in Business Administration strongly preferred

- 2+ years HR experience required, HR experience in an industrial setting is strongly preferred

- Supervisory experience preferred

**KNOWLEDGE, SKILLS AND ABILITIES**

- Ability to work on many different tasks and priorities simultaneously in a high stress environment with superior time management skills

- Observe and comply with all safe work practices

- Thorough knowledge of company benefits and policies

- Working knowledge of basic employment law, ADA, FMLA, i-9, and MSHA regulations

- Project a positive attitude and professional appearance

- Strong leadership and teambuilding and public speaking skills

- Focused customer service orientation

MM0412
APP 064

- Strong PC skills (MS Office / Windows environment)

- Experience with PC or web based HR Info Systems; Ceridian HRIS experience preferred

- Able to communicate effectively with employees at all levels

- Able to handle position responsibility with creativity

- Knowledge of Governmental regulations and requirements. (EEO, AAP, MSHA, DOT, DOL, Workers' Compensation, State Employment Commissions, etc.)

- Positive, professional impact

- Self-starter, Team Player

- Exceptional organizational, analytical and problem solving skills with a strong attention to detail

- Occasional overnight travel, up to a week at a time

- Must be able to read, write, and speak the English language fluently

**PHYSICAL REQUIREMENTS**

While performing the duties of this job, the employee is occasionally required to move around the work area: sit; perform manual tasks; operate tools and other office equipment such as computer, computer peripherals and telephones; extend arms; kneel, stoop and bend to access files; talk and hear. The employee must occasionally lift and/or move up to 25 pounds.

**WORKING CONDITIONS**

Most time is spent in an air conditioned office environment with regular periods of work spent outdoors in the plant environment which may include all weather conditions-heat, cold, wet or dry. May be exposed to dust, sand, gravel, diesel exhaust, cement, etc.

**DISCLAIMER**

The above statements are intended to describe the general nature and level of work being performed by people assigned to this classification. They are not to be construed as an exhaustive list of all responsibilities, duties, and skills required of personnel so classified. All personnel may be required to perform duties outside of their normal responsibilities from time to time, as needed.

**Benefits:**

- Medical

- Prescription Drug

- Dental

- Vision

- Health Care Reimbursement Account

- Dependent Care Reimbursement Account

- Wellness Programs

- Employee Assistance Plan

- Paid Holidays and Vacation

- 401(k) - with Company matching

- Pension

- Salary Continuation -- Short-term Disability

MM0413
APP 065

- Long-Term Disability Options
- Employee Life Insurance
- Spouse & Dependent Life Insurance
- Business Travel Accident Insurance
- Direct Deposit Payroll
- Educational/Tuition Assistance Plan
- College Scholarship Program – for dependent children
- Matching Gift Program
- New Auto Purchase Discount Plans

Martin Marietta - Cement - 17 days ago

Apply Now

**Save this job**

**Email this job to yourself or a friend:**

1. From my email address:
2. To email address:
3. [Send]

--
Bridgette Hurst
214-949-5376

--
Bridgette Hurst
214-949-5376

4

**MM0414**
APP 066

1    A.    Correct.

2    Q.    And people at the Midlothian facility when

3 Bridgette Hurst initially served as administrative

4 manager generally liked her and respected her.  Correct?

5    A.    Correct.

6    Q.    You had no problems with Ms. Hurst when she

7 served in the administrative manager role previously.

8 Correct?

9    A.    Correct.

10   Q.    And Ms. Hurst actually applied for the position

11 of administrative manager in 2015.  Right?

12   A.    Correct.

13   Q.    And she was selected over you.  Correct?

14   A.    Correct.

15   Q.    So Ms. Hurst was selected to fill a position

16 that she had already successfully filled.  Correct?

17   A.    Correct.

18   Q.    And it would be reasonable for an employer to

19 pick Ms. Hurst over you.  Correct?

20        MR. BHATTI:  Objection, form.

21   A.    I do not agree with that.  The reason I do not

22 agree with that is because Ms. Hurst -- she did work

23 there and she quit.  Mr. Hurst quit.  And based on when

24 they put the job back out there and with the

25 qualification they had in here, based on the



1    qualification, my qualification equaled her qualification

2    or better because she had a two-year degree in human

3    resource.  I had a four-year degree.

4          The other thing is that I also did prior stuff

5    in the military.  I served as the -- I was a recruiter

6    with the Army.  Also I was the senior human resource guy

7    of three stations.  And by me not having been afforded

8    the opportunity of that, I think my resume basically --

9    comparing resume with resume, I believe my resume was

10   stronger than hers.

11       Q.   (BY MR. BIRRER) And you weren't making the

12   decision.  Correct?

13       A.   No.

14       Q.   Okay.  So setting aside resumes, would it be

15   fair to say that Martin Marietta didn't have to look at a

16   resume to know whether Bridgette Hurst could successfully

17   perform the job because she had already performed the

18   job.  Correct?

19       A.   That's correct.

20       Q.   So they knew how Bridgette Hurst would fulfill

21   the role.  Correct?

22       A.   Correct.

23       Q.   You were an hourly employee working in the

24   warehouse.  Correct?

25       A.   Correct.





6/30/2015

Bridgette Hurst
1816 Sunbeam Ct
Midlothian, TX 76065

Dear Bridgette:

We are pleased to confirm our offer to you for the position of Administrative Services Supervisor with a starting date of July 13, 2015. The position will be based at our Midlothian Office in Midlothian, TX and report to Randy Walser, Plant Manager.

The annual base salary for this job is $55,000.00. You will be paid $2291.66 on a semi-monthly basis. Effective in 2015, you will also be eligible to participate in our management incentive program (MIP) at a target of 7% of actual annual earnings. Awards under this program are based on the corporation's performance and the individual's performance against established goals.

You will earn 0.8333 days of vacation for each full month worked during the current calendar year. As of August 1, 2015, you will accumulate 0.8333 days of vacation per month, or 4 days to be taken during the 2015 calendar year. You will begin to accumulate 1.25 days of vacation per month, or 15 days per year, during your 5th year of employment.

You will be covered under an assigned level of health coverage on your first day at work. This will include a Blue Cross Blue Shield Preferred Provider Organization (PPO) medical plan, a Preventive Option dental plan, employee life insurance at 1.5 times your base salary, and LTD at the 50% level. There is no cost to you for this assigned coverage during the initial period. You will receive materials by mail to call a toll-free number and elect options in our flexible benefits program to be effective the first of the month following 30 days of employment. Provided you enroll your eligible dependents at that time, coverage for them will be retroactive to your employment date. Your contributions for the benefits you elect will be deducted from your pay semi-monthly. You will be eligible to participate in the 401(k) plan and Martin Marietta Materials, Inc. Pension Plan upon hire. You will automatically be set up to participate in the 401(k) plan with a 3% pre-tax deduction to be effective approximately 45 days following employment. Enrollment materials for the 401(k) will be mailed to you shortly after your employment date, which will allow you time to make a change to the amount or allocation of the deduction.

As you know, our offer of employment is contingent on your passing a drug screening test consistent with our substance abuse policy, as well as your providing proof that you are legally employable in the United States. A company representative will contact you to arrange for the drug test. In addition, this offer is conditional upon your passing a background check. It is important to note that this offer of employment should not be construed as an employment

1503 LBJ Freeway, Suite 400, Dallas, TX 75234



agreement.  Either the employee or the company may terminate employment at any time with or without cause.

We look forward to having you join us.  Should you have any questions, please do not hesitate to contact me at (972) 647-3914 or Randy Walser at (972) 647-4962.

Sincerely,

*Anita Krishnan*

Anita Krishnan
HR Specialist


CC: Randy Walser


Foregoing terms and conditions hereby accepted:

Signature: _Bridgetta Hurst_

Date: _6-30-15_

1503 LBJ Freeway, Suite 400, Dallas, TX 75234

**MM0416**
APP 070

1816 Sunbeam Ct.
Midlothian, Texas 76065

bhurst467@gmail.com
Cell: 214-949-5376

# Bridgette Hurst

**Profile Statement**   Passionate professional acknowledged for delivering top notch customer service, leadership, and sound judgment with the ability to anticipate needs and problems. I continually show independence, resourcefulness, and pay special attention to detail. Equally effective at coordinating, managing and handling difficult high-stress situations with a positive demeanor.

**Education**   Jan 2005—Dec 2007          Angelina College                    Lufkin, TX
**Associates of Applied Science in Office Administration**
- Accomplishments:
  - Graduated with a 3.76 grade point average while working full time
  - Member of Alpha Beta Gamma honor society
  - Member of Phi Theta Kappa honor society

**Relevant Experience**   September 2013—October 2014   TXI / Martin Marietta          Midlothian, TX
**HR Administrative Support / HR Administrator**
- Effectively became a trusted advocate with a positive attitude employees felt comfortable coming to for help, guidance and HR knowledge
- Showed adept communication skills through all departments when doing so would improve processes and procedures
- Routinely showed initiative and innovation through my daily tasks
- Trained on BirdDog recruiting system, Kronos system, i-9 process and HR procedures
- Current Notary Public
- Selected for and currently a member of the 2014-2015 Leadership Midlothian class
- Continuously displays tact, discretion and ultimate sensitivity when dealing with confidential matters

Sept 2009—Sept 2013          FKP Architects                    Dallas, TX
**Administrative Assistant / LMS Administrator**
***Currently working part-time / from home for FKP***
- Assisted with new hire paperwork and orientation
- Actively participated in the interview process for new hire candidates
- Arranges meetings, conferences, and schedules appointments for higher management
- High level of knowledge in Microsoft Office: Word, Excel, PowerPoint, and Outlook
- Successfully supports project managers in the preparation and maintaining project correspondence, reports and other project-related documents including meeting notes.
- Coordinates training for all company architects in 2 locations as well as remote employees
- Responsible for the everyday LMS logistical requirements, procedures and processes, which include managing the LMS system, adding and deleting users, entering course data into the database and ensuring course information and training calendar is accurate and up to date at all times
- Coordinates in-house office meetings for teams and consultants.
- Maintains calendars/schedules for Principals/Project Managers – schedule meetings, book conference rooms.
- Maintains all technical equipment in all conference rooms as well as training for the equipment as needed.
- Completes travel arrangements and expense reports for project members
- Demonstrates ability to communicate effectively and professionally with excellent

Page 1 of 2

MM0417
APP 071

verbal and written communication skills.
- Coordinates all office parties and events.

Accomplishments:

  - Awarded a national scholarship contest from "The Society of Design Administration" to attend a 3 day conference in Denver Colorado.
  - Awarded for my assertiveness in undertaking the role of Dallas office training coordinator.
  - Awarded Professional of the Semester by my co-workers

Aug 2005—March 2008          El Chico Restaurant                    Huntsville, TX
**Assistant Manager / Bartender / Waitress**
- Keenly managed staff and overall operational aspects of the restaurant during my shift
- Actively re-developed operating procedures to improve operations
- Consistently resolved conflicts by using outstanding management and judgment skills
- Effectively resolved scheduling conflicts between staff members
- Excelled in my position while attending college and working full-time

March 2004—March 2005          Hampton Inn/Comfort Suites              Sherman, TX
**Sales Manager**
- Actively pursued local companies for repeat business with frequent interactions to gain loyalty to our brand
- Negotiated special room rates for local businesses as well as special events
- Planned and organized a successful re-grand opening for Comfort Suites
- Partnered with a local radio station and contributed to a radio interview to boost publicity
- Routinely managed the office staff when the general manager was away
- Networked with other professionals through local professional organizations

Sept 2000—Sept 2003          United States Air Force
**Administrative Assistant to Aircrew/Operations Resource Management**
- Completely reorganized and improved filing system for large office
- Scheduled daily flights for rescue mission training sorties
- Created Excel spreadsheets to improve outgoing information
- Provided direct administrative support to the Director of Operations and aircrew
- Competently aided in maintaining calm demeanor in crisis situations by using good judgment

Bridgette Hurst

**MM0418**
APP 072



Martin Marietta - Cement

Storeroom Attendant
Location: Midlothian, TX   76065
Recruiter: Bridgette Hurst / Stefanie Gaines
Hiring Manager: Eric Wilson

**Job Description:**

The Storeroom Attendant reports to the Storeroom Supervisor and is responsible for organizing and maintaining an accurate count of items in the Storeroom as well as shipping items as needed.

**Responsibilities:**

- Organizing inventory in the storeroom
- Shipping
- Performing physical inventory cycle counts, updating CMMS system and generating adjustment reports
- Housekeeping
- Lockout
- Cross-training with Storeroom Attendant II, Storeroom Assistant, and Tool room Attendant positions

**Requirements:**

- High school diploma or equivalent
- Ability to read, write, and verbally communicate in the English language
- Must be able to read and understand operating manuals for mobile equipment operated
- Must be able to drive and operate mobile equipment using levers and pedals to operate
- Pass required physical examination and drug screens
- Preferred (2) years' experience in cement or related industry
- Preferred knowledge of JD Edwards
- Preferred knowledge of all types of equipment used in the manufacturing of cement
- Knowledge of hazards associated with areas of responsibility

**MM0334**
APP 073

1   manager was in there.  So I'm assuming --

2       Q.    Who?  The plant manager?

3       A.    Her, the plant manager, and Terry Doyle in that

4   time frame.  Terry Doyle was the human resource outside

5   the plant.  From my recollection, I'm thinking that she

6   was the person to go to because she's the one that

7   submitted the -- posted the job and all that.  So she's

8   the one who I went to.

9       Q.    Okay.  So I'm just asking you, so you don't

10  know who made -- you believe the plant manager made the

11  hiring decision, and you don't know who else was involved

12  in the hiring process to pick Bridgette Hurst.  Is that

13  correct?

14      A.    That's correct.

15      Q.    Okay.  And Terry Doyle is a senior HR

16  professional at Martin Marietta.  Correct?

17      A.    Correct.

18      Q.    And he was in your interview.  Is that right?

19      A.    Correct.

20      Q.    And so you said Karen -- you spoke with Karen

21  about the decision to hire Bridgette?

22      A.    Correct.

23      Q.    What did Karen say?

24      A.    When I went to Karen -- when I went to Karen

25  about the decision, she said, "Well, looking at the



1    paperwork, looking at your background, you had more

2    qualifications than she did.  The decision they made, I

3    don't totally agree with it.  But, hey," she said, "hold

4    your head up, keep your head up."  And she said, "Neal"

5    -- she was sorry.

6        Q.    Okay.

7        A.    So from the aspect what she had told me on

8    that, I took it -- I took that -- that was the first one.

9    I said, "Okay.  Water under the bridge.  Move on."

10       Q.    I just want to make -- so you spoke with Karen

11   after Bridgette Hurst got the position.  Karen said kind

12   words to you and said that she thought you had good

13   qualifications, keep your head up and keep trying.  Is

14   that fair?

15       A.    Not totally accurate.  Based on what Karen

16   said, she said based on the qualification, my

17   qualification was outstanding.  In the Midlothian cement

18   plant, in those positions, no male has ever held any of

19   those positions.  No male.  Not one.

20       Q.    In the HR position?

21       A.    In the HR or the secretary or the manager or

22   any area in there in that office building other than Dan

23   Payne.  He was the safety guy, which is part of the

24   plant.  No male ever held those positions.

25       Q.    Well, Terry Doyle is a man.  Right?



1  were terminated?

2      A.    No.   The thing that was making me upset because

3  prior to that, they had an assistant plant manager.   I

4  used to go ask him -- I did the interview with him and

5  all that stuff.   He told me, "Hey, you did perfect.   You

6  did good.   Excellent."   I said, "Hey, when are you going

7  to post the job?"  "Probably about two weeks."   Okay.   I

8  wait.

9          Then he say -- I go back in two weeks.   They

10  hadn't posted.   He said, "I don't know what they're

11  doing."   He said, "Check back with me."   I check back

12  with him.   Still don't know anything.

13          So then when I found out that it come down

14  to -- boiled down to getting the position, it was between

15  me and LeAnn -- that's the female who got the job -- all

16  of a sudden I started seeing this -- excuse me.   I'm

17  getting a little emotional.   I'm sorry.

18          Going back and forth, back and forth, I recall

19  going out to -- leaving the assistant plant manager's

20  office that day.   I ran across a guy who's name was Clint

21  Gilley.   His name was Clint Gilley.   He told me, "Neal,"

22  he said, "Bud, I know you're qualified for that job, but

23  you have" -- per his words, per our conversation -- "you

24  are not the right color and you are not the right gender

25  for that job."   And he said, "I know you're qualified for

 1   it, but they ain't going to give it to you."

 2        Q.    And what was Clint Gilley's job position?

 3        A.    He was in the maintenance department.

 4        Q.    He was an hourly, non-management employee?

 5        A.    Yes, that's correct.

 6        Q.    And what race is Clint Gilley?

 7        A.    He's Caucasian.

 8        Q.    So you don't have any reason to think that

 9   Clint Gilley was involved in the decision-making process

10   on who to hire for the planner position.  Correct?

11        A.    That's correct.

12        Q.    So I just want to make -- you've had a lot of

13   testimony.  I just want to make sure I get the facts down

14   right about what was said.  So on the day of your

15   termination, Bridgette Hurst came to you and said, "I

16   need you to come meet with myself and Eric Wilson."  You

17   walked into Eric Wilson's office with Bridgette, and the

18   three of you had a meeting.  Correct?

19        A.    That's correct.

20        Q.    And at that meeting, Bridgette had documents

21   which you recall she handed to Eric Wilson.  Correct?

22        A.    That's correct.

23        Q.    And at the meeting, Eric read from the

24   documents to you, and you perceived him as becoming

25   upset.  Correct?  Is that correct?

1   questions.  So you've indicated that the co-workers that

2   you indicate have encouraged you to file the lawsuit are

3   Mike Martinez, Eric Wilson, a gentleman named Ebenezer.

4   Anyone else that you can recall right now?

5       A.    Yes, another one that I can recall is -- he was

6   the production manager and I met him going out, and he

7   recommended me to go get a lawyer.  What's his name?  I

8   can see his face, but I can't recall his name.  This

9   happened in 2016.

10      Q.    Okay.  That's fine.  So what -- tell me as

11  closely as you can recall, what did Mike Martinez say to

12  you?

13      A.    On that --

14      Q.    Let me re-ask that question because it was a

15  little unclear.

16          You've already testified that Mike Martinez

17  spoke with you after you were terminated about a

18  potential lawsuit.  So if you could, tell me about the

19  conversation between you and Mike Martinez.

20      A.    On that day, I was called up to Eric Wilson's

21  office who was the production -- my supervisor at that

22  time frame.  And as I was going out of there, he said --

23  he looked at the frustration on my face and said, "What's

24  wrong, man?"  I said, "Man, they terminated me."  He

25  said, "For what grounds?"  And basically I said, "They

1    say that I was late, but I wasn't late."

2           But anyway, he said, "Oh, man."  He said, "You

3    know what that is.  Right?"  I said, "What is it?"  He

4    said, "That means they already gave that job to the other

5    female."  I forgot her name.  "They gave the job to her

6    and they're trying to get you out the door to hush you

7    up."  He said, "If I were you, I would get me a lawyer."

8           Q.    Do you recall anything else from that

9    conversation?

10          A.    That's basically what I can recall from that.

11   It's 2016.

12          Q.    And what was Mike Martinez's job position?

13          A.    Me and him was both -- I think Mike was -- he

14   was a lead clerk.  Lead clerk.

15          Q.    Lead clerk?

16          A.    Yes.  He was in the storeroom.

17          Q.    Storeroom clerk?

18          A.    Yes, storeroom clerk.

19          Q.    So Mike Martinez was a storeroom clerk?

20          A.    Yes.

21          Q.    And you were a storeroom clerk?

22          A.    That's correct.

23          Q.    So you and Mike Martinez worked together.

24   Correct?

25          A.    Correct.



Neal Davis

1    Q.    Would it be fair to say that you and Mike

2  Martinez worked together more than anyone else at the

3  company?

4    A.    Yes.

5    Q.    And Mike Martinez was an hourly non-management

6  employee.  Correct?

7    A.    That's correct.

8    Q.    You have testified that Eric Wilson spoke with

9  you about filing a lawsuit.  Is that correct?

10   A.    That's correct.

11   Q.    Tell me about your conversation with Eric

12  Wilson.

13   A.    Basically dealing with Eric on that particular

14  day, HR had came up and told me, "Hey, I need to speak

15  with you."  I can't think -- sorry.  I can't recall the

16  name.  But anyway, she came up --

17   Q.    Was it Bridgette Hurst?

18   A.    Bridgette, yeah.  Bridgette shake hands with me

19  and say, "I need to speak with you.  We need to go into

20  Eric's office."

21        So we got into Eric's office.  Eric started

22  trying -- he tried to read me the statement that

23  Bridgette had typed up, but he couldn't finish it because

24  he broke out emotionally.  He just basically torn up

25  about the whole deal.  And he said, "I'm sorry.  This is

Neal Davis

1  wrong."  He said, "This is wrong."

2          I said, "All right.  Hey, man" -- basically, me

3  being on the other side, I was trying to -- "Hey, man,

4  don't worry about it."  He said, "Man, don't let them get

5  you like that."  He said, "This is" -- I can't recall the

6  exact words he said, but basically going out he say,

7  "Hey, if I were you, I'd fight it."

8      Q.    So how do you know Bridgette typed up the notes

9  that he was reading?

10     A.    Well, I do not know that Bridgette is the one

11  who officially typed them up.  I don't know who typed

12  them, but she was the one that present them.

13     Q.    I thought you said Eric is the one who

14  presented them?

15     A.    That's not what I said.  What I said was that

16  Bridgette came and got me and took me to Eric Wilson's

17  office.  She had the paper in her hand.  She gave the

18  paperwork to Eric Wilson to read to me.  He could not do

19  it.

20     Q.    Okay.  And so at your termination meeting, the

21  only two people present were you, Eric Wilson, and

22  Bridgette Hurst.  Correct?

23     A.    That is correct.

24     Q.    And so do you know who made the decision to

25  terminate you?



Neal Davis

1    A.    I do not know who made the final decision, but

2    I do know it wasn't my supervisor.

3    Q.    It was not Eric Wilson is what you said?

4    A.    It was not Eric Wilson.

5    Q.    And you know that based on what you heard in

6    the meeting, the termination meeting?

7    A.    No, based on his reaction, based on him -- he

8    was trying to read the termination, and I know for a fact

9    that it didn't come from him.

10   Q.    How do you know for a fact?

11   A.    Because usually when I'm out for -- usually if

12   Eric has something strong on his mind, he's going to tell

13   you.  He's an upfront guy.  He's going to be straight

14   forward with you.  On that particular day, I know he was

15   totally out of his character and it wasn't him.

16   Q.    So you're -- so in other words, no one told you

17   who made the decision to terminate your employment.

18   Correct?

19   A.    That is correct.

20   Q.    And so based on your observation of Eric Wilson

21   on the day of your termination, you're assuming that he

22   didn't make the decision.  Correct?

23   A.    Based on that day, I know it wasn't Eric.  And

24   the reason why I know it wasn't Eric, Eric Wilson had

25   basically came out and said, "They are making me do

1  this."  So "They are making me do this," that means

2  that's not Eric Wilson.

3      Q.    So now is it your testimony that at the meeting

4  with you, Bridgette, and Eric, that Eric said, "They are

5  making me do this"?

6      A.    Yes.

7      Q.    So with Bridgette sitting there, he said that?

8      A.    Yes.

9      Q.    Okay.  Do you recall anything else that was

10 said during the meeting where you, Eric, and Bridgette

11 were present?

12     A.    Yes.

13     Q.    What?

14     A.    I recall that as I was -- I was upset, Eric was

15 upset, and basically Bridgette trying to console me, she

16 told me, she said, "Neal, don't feel so bad.  There's

17 more opportunity outside that gate."  Point blank.

18 There's more -- she said, "Look at what you got going for

19 you.  You have your military background, your education.

20 You have a lot going for you, guy."

21     Q.    Do you recall anything else that was said

22 during the termination meeting other than what you've

23 testified to?

24     A.    Basically other than that, at the end I said,

25 "I would like to speak to the plant manager."  She said,



Neal Davis

1   "You can do that."

2       Q.    And who was the plant manager?

3       A.    Randy Walsher [sic].

4       Q.    Randy Walsh?

5       A.    Walsher, W-a-l-s-h-e-r.

6       Q.    Walsher.  And so before we go away from the

7   termination meeting, based on your testimony, both

8   Bridgette and Eric Wilson were compassionate and caring

9   towards you during the termination meeting.  Correct?

10      A.    Eric Wilson, yes.  Bridgette, I wouldn't say

11  more compassionate of her.  I think she'd been more

12  sarcastic when she said her statement.

13      Q.    What leads you to say that?

14      A.    Because any time you tell an employee you can

15  go out there and find something else, that's not

16  compassionate.

17      Q.    So those particular words irritated you

18  somehow?

19      A.    Yes, they did.

20      Q.    Okay.  But did anyone raise their voice during

21  the meeting, the termination meeting.

22      A.    Not that I recall.

23      Q.    Did you raise your voice?

24      A.    Not that -- well, yes, I did.  I did raise my

25  voice.



1      Q.     You raised your voice, but neither Eric nor

2    Bridgette raised their voice in response.  Correct?

3      A.     No.  The idea when I say I raised my voice when

4    I asked her to give me the real reason why y'all are

5    terminating me.  I raised my voice then.  Then I

6    basically told her, I said, "It all boils down to me

7    being black" -- I'm just going to come out and say this.

8    I'm sorry for saying this but "me being black.  I'm more

9    qualified for the job and y'all are putting her over here

10   and she's not qualified and y'all know that she's not

11   qualified."  And basically I told them, "Y'all did this

12   for months and months and months.  The job stayed posted.

13   Took it off the board.  Put it back on the record.  I

14   reapplied and still my qualifications -- how I know my

15   qualifications out-rise her during that time frame

16   because it come from her mouth, from LeAnn's mouth, the

17   one who took -- the one who is getting the position,

18   during that time frame."

19            And excuse me that I'm getting hostile.

20   Sometime when I go back to that day, when I go back to

21   that day, it just does something to me because of the way

22   they did that.  I have never experienced that my whole

23   time, in my life.

24            MR. BIRRER:  Move to strike as

25   nonresponsive.

1    Q.   (BY MR. BIRRER) Mr. Davis, I'm going to -- the

2    purpose of the deposition is for me to ask questions.  I

3    know that you're passionate about your case.  But if you

4    could just listen to my questions and try to focus in on

5    those question, I'd appreciate it.

6         And so have you now -- have you now testified

7    as to everything you can recall during -- that was said

8    during the termination meeting between yourself, Eric,

9    and Bridgette?

10   A.   Can you repeat that again?

11   Q.   Sure.  You've testified already about there was

12   a termination meeting where you were present, Eric Wilson

13   was present, and Bridgette Hurst was present.  Correct?

14   A.   That's correct.

15   Q.   Okay.  And I've asked you what was said during

16   the meeting, and you've testified to that already.

17   Correct?

18   A.   Correct.

19   Q.   Is there anything else that you remember that

20   you haven't told me yet that was actually said during the

21   meeting?

22   A.   That's everything, I assume.

23   Q.   And so you have indicated that when you reflect

24   back on the date of your termination, you become upset.

25   And is the thing that upsets you just the fact that you

Neal Davis

1   were terminated?

2     A.   No.  The thing that was making me upset because

3   prior to that, they had an assistant plant manager.  I

4   used to go ask him -- I did the interview with him and

5   all that stuff.  He told me, "Hey, you did perfect.  You

6   did good.  Excellent."  I said, "Hey, when are you going

7   to post the job?"  "Probably about two weeks."  Okay.  I

8   wait.

9          Then he say -- I go back in two weeks.  They

10   hadn't posted.  He said, "I don't know what they're

11   doing."  He said, "Check back with me."  I check back

12   with him.  Still don't know anything.

13          So then when I found out that it come down

14   to -- boiled down to getting the position, it was between

15   me and LeAnn -- that's the female who got the job -- all

16   of a sudden I started seeing this -- excuse me.  I'm

17   getting a little emotional.  I'm sorry.

18          Going back and forth, back and forth, I recall

19   going out to -- leaving the assistant plant manager's

20   office that day.  I ran across a guy who's name was Clint

21   Gilley.  His name was Clint Gilley.  He told me, "Neal,"

22   he said, "Bud, I know you're qualified for that job, but

23   you have" -- per his words, per our conversation -- "you

24   are not the right color and you are not the right gender

25   for that job."  And he said, "I know you're qualified for

1  it, but they ain't going to give it to you."

2      Q.    And what was Clint Gilley's job position?

3      A.    He was in the maintenance department.

4      Q.    He was an hourly, non-management employee?

5      A.    Yes, that's correct.

6      Q.    And what race is Clint Gilley?

7      A.    He's Caucasian.

8      Q.    So you don't have any reason to think that

9  Clint Gilley was involved in the decision-making process

10  on who to hire for the planner position.  Correct?

11      A.    That's correct.

12      Q.    So I just want to make -- you've had a lot of

13  testimony.  I just want to make sure I get the facts down

14  right about what was said.  So on the day of your

15  termination, Bridgette Hurst came to you and said, "I

16  need you to come meet with myself and Eric Wilson."  You

17  walked into Eric Wilson's office with Bridgette, and the

18  three of you had a meeting.  Correct?

19      A.    That's correct.

20      Q.    And at that meeting, Bridgette had documents

21  which you recall she handed to Eric Wilson.  Correct?

22      A.    That's correct.

23      Q.    And at the meeting, Eric read from the

24  documents to you, and you perceived him as becoming

25  upset.  Correct?  Is that correct?



Neal Davis

1    A.    Not absolutely.  As Eric proceeded to read it,

2  he couldn't read it.

3    Q.    Okay.

4    A.    He got too emotional.  Bridgette had to finish

5  it up.

6    Q.    Okay.  So then Bridgette took the document and

7  finished giving you -- reading the document to you.  Is

8  that correct?

9    A.    That's correct.

10    Q.    And then after Bridgette finished reading the

11  document to you, she made the statement that said that

12  there are other things outside those gates or something

13  to that effect.  Correct?

14    A.    That's correct.

15    Q.    And then was that the end of the meeting?

16    A.    Yes, that was the end of the meeting.  Then she

17  proceeded me to my office to get my things.

18    Q.    Okay.  So have we just done a nice recitation

19  from when Bridgette got you in the facility until when

20  she walked you out of that meeting to get your stuff?

21    A.    That's correct.

22    Q.    Okay.  Did I leave anything out?  This is my

23  chance to ask you questions.

24    A.    To the best of my knowledge, you hit it.

25    Q.    Okay.  Great.  And you said at one point at the

1    meeting, you asked to talk to the plant manager, Randy

2    Walsher.  Is that correct?

3        A.    That's correct.

4        Q.    And when did you speak with Randy, if ever?

5        A.    When I got down to the office, I knew he was

6    there.  But the second chair basically said that he was

7    tied up.  I said, "Okay.  I'll wait."  And I waited and

8    waited, and he never talked to me.

9        Q.    Okay.  So once again, if you could just try to

10   answer the question that I ask.

11            So on the day of your termination, you never

12   spoke with the plant manager.  Correct?

13       A.    Correct.

14       Q.    And then you left the facility.  Is that right?

15       A.    Correct.

16       Q.    And when is the next time you spoke with Eric

17   Wilson?

18       A.    I spoke to Eric Wilson the same night.  Same

19   day.

20       Q.    By telephone?

21       A.    By telephone.

22       Q.    So you called him from your cell phone?

23       A.    No, he called me.

24       Q.    On your cell phone?

25       A.    Yes.



**MARTIN MARIETTA MATERIALS**
**Supervisor's Report of Incidence**

Employee Name:   **Neal Davis**                    Employee Number: XXXXXX

Location: Midlothian 54731                         Date: January 21, 2016

**Description of violation or incident (include date and time):** It has come to our attention that in the past 12 months, you have been tardy 24 times. According to our attendance policy this is unacceptable.

**Previous attempts to correct:** You were previously given a written warning on for being tardy 29 times in 12 months.

**What happens if not corrected:** Neal, your tardies has become a habitual pattern and given the fact that you have already been warned, the decision has been made to terminate your employment with Martin Marietta.

Check applicable step:

☐ **Oral Warning** (I have counseled the employee on the violation and corrective measures that can be taken)

☐ **Written Warning** (Copy of this report has been given to the employee)

☐ **Suspension** (Copy of this report has been given to the employee)

☒ **Termination**

**Flagrant or continued violations after any of the above steps may result in further disciplinary action up to and including termination.**

_Eric M. Wilson_                                   _____
Supervisor's Signature                             Employee's Signature
                                                   (Indicate employee's refusal to sign)

_Randy Wilson_
Plant Manager / Department Head Signature

*(Original:  Employee File;  Copy:  Employee;  Copy:  Human Resources)*

 **Texas Cement**
**Attendance Standards**

Good attendance is an obligation that the employee promises to meet when he / she accepts employment with Martin Marietta, and it is an obligation that continues throughout his / her career.

**Definition of Absence**
Any failure to report to work for an entire shift, whether reported or not reported, is an absence unless the employee:

- is serving on Jury Duty;
- is on a prearranged Vacation;
- is on FMLA Qualifying Leave (medical certification will be required);
- is on Non-FMLA Medical Leave (medical documentation will be required);
- is on Military Leave;
- is on Approved Funeral leave (paid or unpaid);
- is away from work due to a work related injury; or,
- has been excused by his / her immediate supervisor as a result of hours worked in the previous 24 hours.

**Definition of Tardiness**
Any failure to report to work at the assigned time, any departure from work during the assigned work hours, or any departure from work at the end of the day, prior to the assigned time is considered to be tardiness.

Note: For purposes of the following sections, two "tardies" will be treated as one "absence."

**Reporting Off Work (Call In Requirement for Absence / Tardiness)**
1. An employee who is going to miss work, for any reason, must personally notify the Company by contacting his / her supervisor, the supervisor's relief, or designee as appropriate.
2. The employee is expected to make this notification by personal telephone conversation with the supervisor or designee (not by voicemail, email, text or a 3rd party).
3. This notification must reach the Company prior to the start of the employee's scheduled shift, or the absence will be treated as a "no call" absence.
4. If an employee misses 3 consecutive workdays without notifying the Company, he / she shall be considered to have voluntarily resigned without notice. The effective date of the termination will be the last day the employee reported to work.

The guidelines described below should be followed in dealing with attendance problems. This is merely a guideline. Recurrent/chronic attendance problems may result in an accelerated disciplinary process. (Note: The example assumes the employee has not received any disciplinary action unrelated to attendance. If an employee has current disciplinary actions on file for any reason, then attendance policy violations would result in disciplinary action at the next appropriate step. )

Effective 1/1/2015                                                        Page 1 of 2

**MM0033**
APP 092

 **Texas Cement**
**Attendance Standards**

### Unreported Absences

Unreported or "no call" absences will result in disciplinary action as follows:

| Number of Unreported Absences | During the First 3 Months Of Employment | During any 12-Month Period After the First 3 Months of Employment |
|---|---|---|
| 1 | Written Warning | Written Warning |
| 2 | Employment Terminated for failure to meet attendance standards | Disciplinary Suspension |
| 3 | | Employment Terminated for failure to meet attendance standards |

### Reported Absences

Any unplanned absence by an employee hampers the efficiency of his / her work unit. Calling in to report that he / she will be absent does not constitute an "excused absence" and does not relieve the employee's obligation to maintain a good attendance record.

An absence due to a non-work-related injury or illness hampers the operation to the same degree as any other absence. Since these absences are considered involuntary and may last for several days, they are treated in the following manner in terms of meeting attendance standards.

- An absence of two or more consecutive scheduled workdays due to non-job related injury or illness is considered as a single absence.
- An employee absent for 3 or more consecutive workdays must provide his/her supervisor with an acceptable doctor's release before he / she is allowed to return to work.

| Number of Reported Absences | During the First 3 Months Of Employment | During any 12-Month Period After the First 3 Months of Employment |
|---|---|---|
| 1 | Oral Warning | None |
| 2 | Written Warning | None |
| 3 | Employment Terminated for failure to meet attendance standards | Oral Warning |
| 4 | n/a | Written Warning |
| 5 | n/a | Disciplinary Suspension |
| 6 | n/a | Employment Terminated for failure to meet attendance standards |



Effective 1/1/2015

Page 2 of 2

**MM0034**
APP 093

## Exceptions

| | | |
|---|---|---|
| | Data Up to Date: | 2/8/2016 4:23:44 PM |
| | Executed on: | 2/08/2016 4:23PM GMT-06:00 |
| | Printed for: | hurstbrr |

| | |
|---|---|
| Time Period: | 1/01/2015 - 1/22/2016 |
| Query: | Previously Selected Employee(s) |
| Exceptions: | (1): |Late In| |
| Absences: | Both |

| Exception Day/Date | Exception | Scheduled | Actual or Pay Code | Amount | Amount Over Exception |
|---|---|---|---|---|---|
| | *Comment* | | | | |
| DAVIS, NEAL | ID:  725641 | | | | |
| Thu 1/22/2015 | Late In | 1/22/2015 6:00:00 AM | 1/22/2015 6:01:00 AM | 0:01 | |
| Wed 2/11/2015 | Late In | 2/11/2015 6:00:00 AM | 2/11/2015 6:03:00 AM | 0:03 | 0:02 |
| | *Excused* | | | | |
| Mon 2/16/2015 | Unexcused Absence | | Illness Unpaid | 8:00 | |
| Tue 2/17/2015 | Unexcused Absence | | Illness Unpaid | 8:00 | |
| Wed 2/18/2015 | Unexcused Absence | | Illness Unpaid | 8:00 | |
| Thu 2/19/2015 | Unexcused Absence | | Illness Unpaid | 8:00 | |
| Fri 2/20/2015 | Unexcused Absence | | Illness Unpaid | 8:00 | |
| Mon 2/23/2015 | Unexcused Absence | | Illness Unpaid | 8:00 | |
| Thu 2/26/2015 | Late In | 2/26/2015 6:00:00 AM | 2/26/2015 6:04:00 AM | 0:04 | 0:03 |
| Tue 3/3/2015 | Late In | 3/3/2015 6:00:00 AM | 3/3/2015 6:30:00 AM | 0:30 | 0:29 |
| | *Excused* | | | | |
| Wed 3/4/2015 | Late In | 3/4/2015 6:00:00 AM | 3/4/2015 6:06:00 AM | 0:06 | 0:05 |
| Mon 4/6/2015 | Late In | 4/6/2015 6:00:00 AM | 4/6/2015 6:39:00 AM | 0:39 | 0:38 |
| Mon 4/13/2015 | Late In | 4/13/2015 6:00:00 AM | 4/13/2015 6:05:00 AM | 0:05 | 0:04 |
| | *Train Blocking Entrance* | | | | |
| Wed 4/22/2015 | Late In | 4/22/2015 6:00:00 AM | 4/22/2015 6:01:00 AM | 0:01 | |
| Fri 5/1/2015 | Late In | 5/1/2015 6:00:00 AM | 5/1/2015 6:02:00 AM | 0:02 | 0:01 |
| Mon 5/4/2015 | Late In | 5/4/2015 6:00:00 AM | 5/4/2015 6:01:00 AM | 0:01 | |
| Wed 5/6/2015 | Late In | 5/6/2015 6:00:00 AM | 5/6/2015 6:01:00 AM | 0:01 | |
| Thu 5/14/2015 | Late In | 5/14/2015 6:00:00 AM | 5/14/2015 6:02:00 AM | 0:02 | 0:01 |
| Mon 5/25/2015 | Excused Absence | | Holiday | 8:00 | |
| Tue 5/26/2015 | Excused Absence | | VacHrly-Curr Yr | 8:00 | |
| | *Comment* | | | | |
| Wed 6/3/2015 | Late In | 6/3/2015 6:00:00 AM | 6/3/2015 6:01:00 AM | 0:01 | |
| Fri 6/5/2015 | Late In | 6/5/2015 6:00:00 AM | 6/5/2015 6:02:00 AM | 0:02 | 0:01 |
| Wed 6/10/2015 | Late In | 6/10/2015 6:00:00 AM | 6/10/2015 6:01:00 AM | 0:01 | |
| | *Clock - PC Punch Failure* | | | | |
| | *Excused* | | | | |
| Thu 6/25/2015 | Late In | 6/25/2015 6:00:00 AM | 6/25/2015 6:01:00 AM | 0:01 | |

## Exceptions

| | |
|---|---|
| Data Up to Date: | 2/8/2016 4:23:44 PM |
| Executed on: | 2/08/2016 4:23PM GMT-06:00 |
| Printed for: | hurstbrr |

| | |
|---|---|
| Time Period: | 1/01/2015 - 1/22/2016 |
| Query: | Previously Selected Employee(s) |
| Exceptions: | (1): |Late In| |
| Absences: | Both |

| Exception Day/Date | Exception | Scheduled | Actual or Pay Code | Amount | Amount Over Exception |
|---|---|---|---|---|---|
| *Comment* | | | | | |
| DAVIS, NEAL | ID:  725641 | | | | |
| Tue 6/30/2015 | Late In | 6/30/2015 6:00:00 AM | 6/30/2015 6:02:00 AM | 0:02 | 0:01 |
| Thu 7/2/2015 | Excused Absence | | VacHrly-Curr Yr | 8:00 | |
| *Other* | | | | | |
| Fri 7/3/2015 | Excused Absence | | Independence Day | 8:00 | |
| Mon 7/13/2015 | Excused Absence | | VacHrly-Curr Yr | 8:00 | |
| *Other* | | | | | |
| Thu 7/16/2015 | Late In | 7/16/2015 6:00:00 AM | 7/16/2015 6:02:00 AM | 0:02 | 0:01 |
| Fri 7/31/2015 | Late In | 7/31/2015 6:00:00 AM | 7/31/2015 6:01:00 AM | 0:01 | |
| Fri 8/7/2015 | Excused Absence | | VacHrly-Curr Yr | 8:00 | |
| Fri 8/14/2015 | Late In | 8/14/2015 6:00:00 AM | 8/14/2015 6:01:00 AM | 0:01 | |
| Mon 9/7/2015 | Excused Absence | | Labor Day | 8:00 | |
| Tue 9/8/2015 | Excused Absence | | VacHrly-Curr Yr | 8:00 | |
| *Other* | | | | | |
| Fri 9/25/2015 | Late In | 9/25/2015 6:00:00 AM | 9/25/2015 6:01:00 AM | 0:01 | |
| Sat 10/3/2015 | Late In | 10/3/2015 6:00:00 AM | 10/3/2015 6:02:00 AM | 0:02 | 0:01 |
| Wed 11/4/2015 | Late In | 11/4/2015 6:00:00 AM | 11/4/2015 6:01:00 AM | 0:01 | |
| Thu 11/26/2015 | Excused Absence | | Thanksgiving Day | 8:00 | |
| Fri 11/27/2015 | Excused Absence | | Thanksgiving Friday | 8:00 | |
| Tue 12/1/2015 | Late In | 12/1/2015 6:00:00 AM | 12/1/2015 6:02:00 AM | 0:02 | 0:01 |
| Mon 12/14/2015 | Late In | 12/14/2015 6:00:00 AM | 12/14/2015 6:02:00 AM | 0:02 | 0:01 |
| Thu 12/24/2015 | Excused Absence | | Christmas Eve | 8:00 | |
| Fri 12/25/2015 | Excused Absence | | Christmas Day | 8:00 | |
| Fri 1/1/2016 | Excused Absence | | New Year's | 8:00 | |
| Thu 1/7/2016 | Late In | 1/7/2016 6:00:00 AM | 1/7/2016 6:05:00 AM | 0:05 | 0:04 |
| Fri 1/15/2016 | Late In | 1/15/2016 6:00:00 AM | 1/15/2016 6:03:00 AM | 0:03 | 0:02 |

| Exception | Total | Total Amount Over Exception |
|---|---|---|
| Excused Absence: | 13 | N/A |
| Late In: | 27 | 1:35 |
| Unexcused Absence: | 6 | N/A |

MM0036
APP 095

## Exceptions

| | |
|---|---|
| Time Period: | 1/01/2015 - 1/22/2016 |
| Query: | Previously Selected Employee(s) |
| Exceptions: | (1): |Late In| |
| Absences: | Both |

| | |
|---|---|
| Data Up to Date: | 2/8/2016 4:23:44 PM |
| Executed on: | 2/08/2016 4:23PM GMT-06:00 |
| Printed for: | hurstbrr |

Total Number of Exceptions:   46

**MM0037**
APP 096

Neal Davis

1    talked to Jason Crowther and you said you thought you

2    were being discriminated against?

3        A.    Correct.

4        Q.    And he said he disagreed with you and said,

5    "We'll talk about it later," and that conversation never

6    happened again?

7        A.    That's correct.

8        Q.    So beyond those two incidents, you don't recall

9    ever having a conversation with anyone else in management

10   where you alleged that you thought you were being

11   discriminated against.  Correct?

12       A.    Correct.

13       Q.    So did Eric Wilson ever make a comment to you

14   that you thought was discriminatory in any way?

15       A.    Not as I recall.

16       Q.    Did Bridgette Hurst ever make a comment to you

17   that you thought was discriminatory?

18       A.    Yes.

19       Q.    What did Bridgette say that you thought was

20   discriminatory?

21       A.    When she basically told me that "You won't get

22   promoted.  The best way to get promoted is out that

23   gate."

24       Q.    Any other comment that you contend that

25   Bridgette Hurst made that you thought was discriminatory?

Neal Davis

1   management ever saying anything belittling or tending to

2   make you think that you were being treated less favorably

3   based on your gender?

4        A.    Yes.

5        Q.    And who was that?

6        A.    Clint Gilley.

7        Q.    And that's the maintenance worker?

8        A.    Correct.

9        Q.    He's not a member of management.  Correct?

10       A.    Correct.

11       Q.    Okay.  I was asking is there anyone who's a

12   member of management at Martin Marietta who ever said

13   anything to you that you thought was belittling or

14   indicating they were treating you less favorably based on

15   your gender?

16       A.    Other than Bridgette, no.

17       Q.    Well, when you say "other than Bridgette,"

18   you're talking about the comment where she said, "Your

19   best opportunities would be out the gate"?

20       A.    Yes.

21       Q.    But that's all she said?  That's what you're

22   focused on, the comment "Your best opportunities are

23   outside that gate"?

24       A.    Well, to a certain extent.  Basically she said,

25   "Hey, you think you deserve more or want to get promoted?



1    Your best opportunity is outside that gate."  And to me,

2    I took it that I don't have a chance here.  That's the

3    way I took it.  Basically if she's the human resource

4    manager, she's saying, "Hey, that's basically a warning.

5    You want to get promoted, you're going to have to leave."

6    That's the way I took it.

7        Q.    Well, it wasn't a warning; she had already

8    fired you when she said that.  Correct?

9        A.    Well, I can't recall before that.  I want to

10   say that conversation happened before the firing, and

11   then she said it again at the firing.

12       Q.    Okay.  So the only comment that Bridgette Hurst

13   made that you take issue with is she said if you want

14   promotional opportunities, it would be best to look

15   somewhere other than Martin Marietta.  Is that correct?

16       A.    That's correct.

17       Q.    Okay.  And I want to ask you, are you aware of

18   anyone in the Midlothian office who was an hourly

19   employee in the warehouse who was promoted into a

20   management position?

21       A.    Yes.

22       Q.    Who?

23       A.    Jeff Simmons, maintenance guy.

24       Q.    Say it again.

25       A.    Jeff Simmons was an hourly guy that got





1341 West Mockingbird Lane • Dallas, Texas 75247 • 972.647.6700

*txi.com*

November 19, 2013

Neal David
245 Ward Rd.
Midlothian ,TX 76065

Neal:

Due to the severity of the alleged actions discussed below, this letter constitutes a final written warning in accordance with TXI's Human Resources Policy Number 11 (P-11).

The purpose of this letter is to communicate the disciplinary action as a consequence for the continuation of certain behavior patterns negatively impacting your work consistency. The following details the subject to this disciplinary action:

*[handwritten: DiD not hAPPen]*   *[handwritten: SAme]*   *[handwritten: verbal]*

As it was addressed verbally on June the 3rd of 2013, and on a written warning on June 11th of 2013 we continue to observe the same behavior pattern for excessive tardiness. The attached repot shows a record that recently there has been multiple tardiness against your work schedule, which is totally unacceptable since this behavior has been addressed with you already on June 11th, 2013. It is imperative for the operation of this company and to the responsibilities of your job that you work the required hours and that you are a reliable employee. When excessive tardiness occurs, it puts undue stress on the plant operations. Our commitment is to provide daily service and support to operations by starting at 6:00 am. You are the employee responsible to initiate these operations in the Warehouse.

*[handwritten: DiD not HAPPen Hurting]*

Additional you cannot request another warehouse employee to change their schedule to accommodate your personal needs as you did on 11/19/2013. The Warehouse supervisor is the only authorized to change employees schedule and/or approve over time.

It was also observed on 11/19/2013 that you left for lunch at 11:57:20 and did not came back from lunch until after 12:39:47 which exceeds the 30 minutes allowance that hourly employees are to take for lunch without clocking in and out.

*[handwritten: WhAT is 7 This?]*

All these behavior of absenteeism from the plant in the morning or around lunch time create disruption from the Warehouse operations to support the Plant.

By signing this document, I understand the ramifications of the final written warning. If there isn't immediate and sustained change in my performance it may result in further disciplinary action up to and including termination of your employment.

*[handwritten left: Peri Lucy Toloter This will be counted This verbal will NO As off 6/11/2014 to SiGN. Need]*

*[handwritten signature area: I, Neal Davis only Received one write up for the 2006 - 2016. Anything else Write of 2006 is 17 Records would Year This is in my forged. consider 1/22/16]*

We will provide EXCEPTIONAL building materials,
SERVICE and solutions so that customers CHOOSE X.

DavisAPP0000



1341 West Mockingbird Lane • Dallas, Texas 75247 • 972.647.6700

*txi.com*

Eric Wilson                                                           Date

Neal Davis                                                           Date

Davis000008

**Davis, Neal**

| | |
|---|---|
| **To:** | Raab, Jill |
| **Subject:** | Attendance Standards/Four Step Guidelines |

I strongly believe good attendance is an obligation that the employee promises to meet when he/she accepts Employment with TXI, and it is an obligation that continues throughout his/her career.

On June 3, 2013  I Neal Davis was given a Verbal Reminder by Lucy Tovar and Eric Wilson on my past Attendance Standards.  After that time No Attendance problems occurred. On June 11, 2013  I was given A Written Reminder for the same incident.  Stating that I should have been up to this point for the past incident. When  Question the written warning I was told not to worry about it, At that time I did not think it was the right decision and still do not think it is today.  Missing steps and unauthorized documents accrued doing that day on June 11,2013. I truly believe the first written Warning should not count because it went with the verbal warning. The Incident that occurred on November 19, 2013  I do not agree with the written notice because my supervisor Was informed and Approve the change.  Furthermore, I did not call another employee to change his work schedule or approve his  over time.

I believe the four steps guidelines was not follow correctly and should be evaluated. Please contact me reference this incident.


Thanks,

Neal Davis

1

| Employee # | Employee Name | Group | Reg | Div | Dist | Home Business Unit | Charge to Business Unit | Obj Acct | Dept | Pay Clas s | Check Date | Work Order Number | Date Worked | Base Pay R | PDBA Code | PDBA Description | Pay Rate | Shift Code | Shift Descr | Shift Diff. | Uprate Amount | Adjusted Pay Rate | Gross Pay | Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 725641 | DAVIS, NEAL | 10 | 9 | 10 | 56 | 54732 | 54558 | 41010 | 70 | H | 3/6/2015 | | 3/1/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 158.58 | 6.15 |
| 725641 | DAVIS, NEAL | 10 | 9 | 10 | 56 | 54732 | 54558 | 41005 | 70 | H | 3/6/2015 | | 3/1/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 548.88 | 31.93 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 801 | H | 10/3/2014 | | 9/28/2014 | 16.57 | 1 | Regular 1 | 16.57 | | No Shift | | | 16.57 | 662.8 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 801 | H | 10/3/2014 | | 9/28/2014 | 24.855 | 100 | Overtime 1.5 | 24.855 | | No Shift | | | 24.855 | 198.34 | 7.98 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41045 | 899 | H | 10/24/2014 | | 10/14/2014 | | 655 | Plant Incent | | | No Shift | | | | 193.85 | |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41045 | 831 | H | 11/14/2014 | | 11/7/2014 | | 655 | Plant Incent | | | No Shift | | | | 305.12 | |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 51045 | | H | 12/19/2014 | | 12/8/2014 | | 655 | Plant Incent | | | No Shift | | | | 112.47 | |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 12/19/2014 | | 12/14/2014 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.6 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 12/19/2014 | | 12/14/2014 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 250.63 | 9.72 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 12/26/2014 | | 12/21/2014 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.6 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 12/26/2014 | | 12/21/2014 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 141.04 | 5.47 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 1/2/2015 | | 12/28/2014 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 137.52 | 8 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 1/2/2015 | | 12/28/2014 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 25.79 | 1 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41035 | 899 | H | 1/2/2015 | | 12/28/2014 | 17.19 | 210 | Holiday | 17.19 | | No Shift | | | 17.19 | 275.04 | 16 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41030 | 899 | H | 1/2/2015 | | 12/28/2014 | 17.19 | 805 | VacH-PriorYr | 17.19 | | No Shift | | | 17.19 | 275.04 | 16 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41035 | 899 | H | 1/9/2015 | | 1/4/2015 | 17.19 | 210 | Holiday | 17.19 | | No Shift | | | 17.19 | 137.52 | 8 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41030 | 899 | H | 1/9/2015 | | 1/4/2015 | 17.19 | 805 | VacH-PriorYr | 17.19 | | No Shift | | | 17.19 | 550.08 | 32 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41045 | 899 | H | 1/16/2015 | | 1/9/2015 | | 655 | Plant Incent | | | No Shift | | | | 77.46 | |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 1/16/2015 | | 1/11/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.6 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 1/16/2015 | | 1/11/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 235.16 | 9.12 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 1/23/2015 | | 1/18/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.6 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 1/23/2015 | | 1/18/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 512.61 | 19.88 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 1/30/2015 | | 1/25/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 409.21 | 15.87 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 1/30/2015 | | 1/25/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 0.52 | 0.02 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 1/30/2015 | | 1/25/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.26 | 39.98 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 2/6/2015 | | 2/1/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.6 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 2/6/2015 | | 2/1/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 228.71 | 8.87 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 2/13/2015 | | 2/8/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.6 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 2/13/2015 | | 2/8/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 393.74 | 15.27 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41045 | 899 | H | 2/13/2015 | | 2/8/2015 | | 610 | Suppl Bonus | | | No Shift | | | | 198.98 | |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 2/20/2015 | | 2/15/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 278.82 | 16.22 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 2/20/2015 | | 2/15/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 91.54 | 3.55 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41057 | 899 | H | 2/20/2015 | | 2/15/2015 | 17.19 | 800 | VacH-Cur Yr | 17.19 | | No Shift | | | 17.19 | 275.04 | 16 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | | | H | 2/27/2015 | | 2/22/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | | |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41057 | 899 | H | 3/6/2015 | | 3/1/2015 | 17.19 | 800 | VacH-Cur Yr | 17.19 | | No Shift | | | 17.19 | -275.04 | -16 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41040 | 899 | H | 3/6/2015 | | 3/1/2015 | 17.19 | 300 | S&A 60% FMLA | 10.314 | | No Shift | | | 10.314 | 742.61 | 72 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 3/13/2015 | | 3/8/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 677.29 | 39.4 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 3/13/2015 | | 3/8/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 270.74 | 10.5 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 3/13/2015 | | 3/8/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 15.47 | 0.6 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 3/20/2015 | | 3/15/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 686.74 | 39.95 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 3/20/2015 | | 3/15/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 1.29 | 0.05 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 3/20/2015 | | 3/15/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 364.34 | 14.13 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 3/27/2015 | | 3/26/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.26 | 39.98 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 3/27/2015 | | 3/26/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 346.29 | 13.43 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 3/27/2015 | | 3/26/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 0.52 | 0.02 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 4/3/2015 | | 3/29/2015 | 17.19 | 1 | Regular 1 | | | No Shift | | | | 687.6 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 4/3/2015 | | 3/29/2015 | | 100 | Overtime 1.5 | | | No Shift | | | | 619.27 | 24.02 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 4/10/2015 | | 4/5/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 412.56 | 24 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 4/10/2015 | | 4/5/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 185.14 | 7.18 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41035 | 899 | H | 4/10/2015 | | 4/5/2015 | 17.19 | 210 | Holiday | 17.19 | | No Shift | | | 17.19 | 137.52 | 8 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41057 | 899 | H | 4/10/2015 | | 4/5/2015 | 17.19 | 800 | VacH-Cur Yr | 17.19 | | No Shift | | | 17.19 | 137.52 | 8 |

The From Check Date: 3/1/2013    To Check Date: 1/25/2016

| Employee # | Employee Name | Group | Reg | Div | Dist | Home Business Unit | Charge to Business Unit | Obj Acct | Dept | Pay Class | Check Date | Work Order Number | Date Worked | Base Pay R | PDBA Code | PDBA Description | Pay Rate | Shift Code | Shift Descr | Shift Diff. | Uprate Amount | Adjusted Pay Rate | Gross Pay | Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | From Check Date: | 3/1/2013 | | | | To Check Date: | 1/25/2016 | | | | | | | | | | | | |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 4/17/2015 | | 4/12/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 676.43 | 39.35 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 4/17/2015 | | 4/12/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 715.02 | 27.73 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 4/17/2015 | | 4/12/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 16.76 | 0.65 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 4/24/2015 | | 4/19/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 686.22 | 39.92 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 4/24/2015 | | 4/19/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 2.06 | 0.08 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 4/24/2015 | | 4/19/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 461.55 | 17.9 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41045 | 899 | H | 4/24/2015 | | 4/19/2015 | | 610 | Suppl Bonus | | | No Shift | | | | 90.96 | |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 5/1/2015 | | 4/26/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.6 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 5/1/2015 | | 4/26/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 3.35 | 0.13 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 5/1/2015 | | 4/26/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 299.62 | 11.62 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 5/8/2015 | | 5/3/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.6 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 5/8/2015 | | 5/3/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 0.52 | 0.02 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 5/8/2015 | | 5/3/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 266.36 | 10.33 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41045 | 899 | H | 5/15/2015 | | 5/10/2015 | | 610 | Suppl Bonus | | | No Shift | | | | 102 | |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 5/15/2015 | | 5/10/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.6 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 5/15/2015 | | 5/10/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 3.09 | 0.12 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 5/15/2015 | | 5/10/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 339.85 | 13.18 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 5/22/2015 | | 5/17/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.6 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 5/22/2015 | | 5/17/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 6.45 | 0.25 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 5/22/2015 | | 5/17/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 172.24 | 6.68 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 5/29/2015 | | 5/24/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.6 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 5/29/2015 | | 5/24/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 399.15 | 15.48 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 6/5/2015 | | 5/31/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 412.56 | 24 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 6/5/2015 | | 5/31/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 300.91 | 11.67 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41035 | 899 | H | 6/5/2015 | | 5/31/2015 | 17.19 | 210 | Holiday | 17.19 | | No Shift | | | 17.19 | 137.52 | 8 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41057 | 899 | H | 6/5/2015 | | 5/31/2015 | 17.19 | 800 | VacH-Cur Yr | 17.19 | | No Shift | | | 17.19 | 137.52 | 8 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 6/12/2015 | | 6/7/2015 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.6 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 6/12/2015 | | 6/7/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 213.5 | 8.28 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 6/12/2015 | | 6/7/2015 | 17.19 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 4.38 | 0.17 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 6/19/2015 | | 6/14/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 707.65 | 39.98 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 6/19/2015 | | 6/14/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 0.53 | 0.02 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 6/19/2015 | | 6/14/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 558.35 | 21.03 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41045 | 899 | H | 6/19/2015 | | 6/14/2015 | | 610 | Suppl Bonus | | | No Shift | | | | 106.11 | |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41005 | 899 | H | 6/26/2015 | | 6/21/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 708 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54732 | 54732 | 41010 | 899 | H | 6/26/2015 | | 6/21/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 504.98 | 19.02 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54732 | 41005 | 899 | H | 7/3/2015 | | 6/28/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 708 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54732 | 41010 | 899 | H | 7/3/2015 | | 6/28/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 267.36 | 10.07 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54732 | 41010 | 899 | H | 7/3/2015 | | 6/28/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 3.45 | 0.13 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 7/10/2015 | | 7/5/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 424.27 | 23.97 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 7/10/2015 | | 7/5/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 190.36 | 7.17 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 7/10/2015 | | 7/5/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 0.8 | 0.03 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41035 | 899 | H | 7/10/2015 | | 7/5/2015 | 17.7 | 210 | Holiday | 17.7 | | No Shift | | | 17.7 | 141.6 | 8 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41057 | 899 | H | 7/10/2015 | | 7/5/2015 | 17.7 | 800 | VacH-Cur Yr | 17.7 | | No Shift | | | 17.7 | 141.6 | 8 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 7/17/2015 | | 7/12/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 708 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 7/17/2015 | | 7/12/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 283.55 | 10.68 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41045 | 899 | H | 7/24/2015 | | 7/19/2015 | | 610 | Suppl Bonus | | | No Shift | | | | 94.16 | |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 7/24/2015 | | 7/19/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 565.87 | 31.97 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 7/24/2015 | | 7/19/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 362.94 | 13.67 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 7/24/2015 | | 7/19/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 0.8 | 0.03 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41057 | 899 | H | 7/24/2015 | | 7/19/2015 | 17.7 | 800 | VacH-Cur Yr | 17.7 | | No Shift | | | 17.7 | 141.6 | 8 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 7/31/2015 | | 7/26/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 708 | 40 |

| Employee | Employee Name | Group | Reg | Div | Dist | Home Business Unit | Business Unit | Obj Acct | Dept | Pay Clas s | Check Date | Work Order Number | Date Worked | Base Pay R | PDBA Code | PDBA Description | Pay Rate | Shift Code | Shift Descr | Shift Diff. | Uprate Amount | Adjusted Pay Rate | Gross Pay | Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | From Check Date: | 3/1/2013 | | | | | To Check Date: | 1/25/2016 | | | | | | | | | | | |
| | | | | | | Charge to Business Unit | | | | | | | | | | | | | | | | | | |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 7/31/2015 | | 7/26/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 285.41 | 10.75 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 8/7/2015 | | 8/2/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 566.05 | 31.98 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 8/7/2015 | | 8/2/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 212.93 | 8.02 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 8/7/2015 | | 8/2/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 84.16 | 3.17 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 8/14/2015 | | 8/9/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 566.4 | 32 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 8/14/2015 | | 8/9/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 258.07 | 9.72 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41057 | 899 | H | 8/14/2015 | | 8/9/2015 | 17.7 | 800 | VacH-Cur Yr | 17.7 | | No Shift | | | 17.7 | 141.6 | 8 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41045 | 899 | H | 8/21/2015 | | 8/16/2015 | | 610 | Suppl Bonus | | | No Shift | | | | 159.33 | |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 8/21/2015 | | 8/16/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 707.65 | 39.98 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 8/21/2015 | | 8/16/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 0.53 | 0.02 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 8/21/2015 | | 8/16/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 746.59 | 28.12 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 8/28/2015 | | 8/23/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 708 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 8/28/2015 | | 8/23/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 487.19 | 18.35 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 9/4/2015 | | 8/30/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 708 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 9/4/2015 | | 8/30/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 818.54 | 30.83 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 9/11/2015 | | 9/6/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 708 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 9/11/2015 | | 9/6/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 525.16 | 19.78 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41045 | 899 | H | 9/11/2015 | | 9/6/2015 | | 610 | Suppl Bonus | | | No Shift | | | | 241.09 | |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 9/18/2015 | | 9/13/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 424.8 | 24 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 9/18/2015 | | 9/13/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 299.48 | 11.28 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41035 | 899 | H | 9/18/2015 | | 9/13/2015 | 17.7 | 210 | Holiday | 17.7 | | No Shift | | | 17.7 | 141.6 | 8 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41057 | 899 | H | 9/18/2015 | | 9/13/2015 | 17.7 | 800 | VacH-Cur Yr | 17.7 | | No Shift | | | 17.7 | 141.6 | 8 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 9/25/2015 | | 9/20/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 708 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 9/25/2015 | | 9/20/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 509.76 | 19.2 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 10/2/2015 | | 9/27/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 708 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 10/2/2015 | | 9/27/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 530.47 | 19.98 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 10/2/2015 | | 9/27/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 931.11 | 35.07 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 10/9/2015 | | 10/4/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 708 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 10/9/2015 | | 10/4/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 848.82 | 31.97 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 10/9/2015 | | 10/4/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 236.3 | 8.9 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 10/16/2015 | | 10/11/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 708 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 10/16/2015 | | 10/11/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 1279.71 | 48.2 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 10/16/2015 | | 10/11/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 66.38 | 2.5 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41045 | 899 | H | 10/16/2015 | | 10/11/2015 | | 610 | Suppl Bonus | | | No Shift | | | | 107.33 | |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 10/23/2015 | | 10/18/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 708 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 10/23/2015 | | 10/18/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 476.57 | 17.95 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 10/23/2015 | | 10/18/2015 | 17.7 | 102 | Call-In 1.5 | 26.55 | | No Shift | | | 26.55 | 106.2 | 4 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 10/30/2015 | | 10/25/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 708 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 10/30/2015 | | 10/25/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 181.34 | 6.83 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 11/6/2015 | | 11/1/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 708 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 11/6/2015 | | 11/1/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 722.16 | 27.2 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 11/13/2015 | | 11/8/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 707.65 | 39.98 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 11/13/2015 | | 11/8/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 0.53 | 0.02 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 11/13/2015 | | 11/8/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 758 | 28.55 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 11/20/2015 | | 11/15/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 708 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 11/20/2015 | | 11/15/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 677.82 | 25.53 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 11/27/2015 | | 11/22/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 708 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 11/27/2015 | | 11/22/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 478.43 | 18.02 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41035 | 899 | H | 12/4/2015 | | 11/29/2015 | 17.7 | 210 | Holiday | 17.7 | | No Shift | | | 17.7 | 283.2 | 16 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41057 | 899 | H | 12/4/2015 | | 11/29/2015 | 17.7 | 800 | VacH-Cur Yr | 17.7 | | No Shift | | | 17.7 | 424.8 | 24 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 12/11/2015 | | 12/6/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | 17.7 | 707.47 | 39.97 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 12/11/2015 | | 12/6/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | 26.55 | 864.2 | 32.55 |

| Employee | Employee Name | Group | Reg | Div | Dist | Home Business Unit | Charge to Business Unit | Obj Acct | Dept | Pay Clas s | Check Date | Work Order Number | Date Worked | Base Pay R | PDBA Code | PDBA Description | Pay Rate | Shift Code | Shift Descr | Shift Diff. | Uprate Amount | Adjusted Pay Rate | Gross Pay | Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 12/11/2015 | | 12/6/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | | 26.55 | 0.8 | 0.03 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41057 | 899 | H | 12/11/2015 | | 12/6/2015 | 17.7 | 810 | VacH Payout | 17.7 | | No Shift | | | | 17.7 | 141.6 | 8 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 12/18/2015 | | 12/13/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | | 17.7 | 708 | 40 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 12/18/2015 | | 12/13/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | | 26.55 | 693.75 | 26.13 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41045 | 899 | H | 12/18/2015 | | 12/13/2015 | | 610 | Suppl Bonus | | | No Shift | | | | | 117.74 | |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 12/24/2015 | | 12/20/2015 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | | 17.7 | 707.47 | 39.97 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 12/24/2015 | | 12/20/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | | 26.55 | 0.8 | 0.03 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 12/24/2015 | | 12/20/2015 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | | 26.55 | 811.63 | 30.57 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41035 | 899 | H | 12/31/2015 | | 12/27/2015 | 17.7 | 210 | Holiday | 17.7 | | No Shift | | | | 17.7 | 283.2 | 16 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41057 | 899 | H | 12/31/2015 | | 12/27/2015 | 17.7 | 800 | VacH-Cur Yr | 17.7 | | No Shift | | | | 17.7 | 424.8 | 24 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 1/8/2016 | | 1/3/2016 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | | 17.7 | 283.2 | 16 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 1/8/2016 | | 1/3/2016 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | | 26.55 | 301.34 | 11.35 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41035 | 899 | H | 1/8/2016 | | 1/3/2016 | 17.7 | 210 | Holiday | 17.7 | | No Shift | | | | 17.7 | 141.6 | 8 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41057 | 899 | H | 1/8/2016 | | 1/1/2016 | 17.7 | 805 | VacH-PriorYr | 17.7 | | No Shift | | | | 17.7 | 283.2 | 16 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41045 | 899 | H | 1/15/2016 | | 1/10/2016 | | 610 | Suppl Bonus | | | No Shift | | | | | 127.24 | |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 1/15/2016 | | 1/10/2016 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | | 17.7 | 706.58 | 39.92 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 1/15/2016 | | 1/10/2016 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | | 26.55 | 409.67 | 15.43 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 1/15/2016 | | 1/10/2016 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | | 26.55 | 2.12 | 0.08 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41005 | 899 | H | 1/22/2016 | | 1/17/2016 | 17.7 | 1 | Regular 1 | 17.7 | | No Shift | | | | 17.7 | 707.12 | 39.95 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 1/22/2016 | | 1/17/2016 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | | 26.55 | 368.25 | 13.87 |
| 725641 | DAVIS, NEAL | 20 | 40 | 20 | 61 | 54731 | 54731 | 41010 | 899 | H | 1/22/2016 | | 1/17/2016 | 17.7 | 100 | Overtime 1.5 | 26.55 | | No Shift | | | | 26.55 | 1.33 | 0.05 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 11/21/2014 | | 11/16/2014 | 25.785 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | | 25.785 | 27.85 | 1.08 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 11/21/2014 | | 11/16/2014 | 25.785 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | | 25.785 | 466.19 | 18.08 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 11/28/2014 | | 11/23/2014 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | | 17.19 | 687.6 | 40 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 11/28/2014 | | 11/23/2014 | 25.785 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | | 25.785 | 235.93 | 9.15 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 12/5/2014 | | 11/30/2014 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | | 17.19 | 412.56 | 24 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 12/5/2014 | | 11/30/2014 | 25.785 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | | 25.785 | 12.89 | 0.5 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 12/5/2014 | | 11/30/2014 | 25.785 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | | 25.785 | 157.29 | 6.1 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51035 | | H | 12/5/2014 | | 11/30/2014 | 17.19 | 210 | Holiday | 17.19 | | No Shift | | | | 17.19 | 275.04 | 16 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 12/12/2014 | | 12/7/2014 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | | 17.19 | 547.85 | 31.87 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 12/12/2014 | | 12/7/2014 | 25.785 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | | 25.785 | 78.13 | 3.03 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 12/12/2014 | | 12/7/2014 | 25.785 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | | 25.785 | 209.63 | 8.13 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51030 | | H | 12/12/2014 | | 12/7/2014 | 17.19 | 800 | VacH-Cur Yr | 17.19 | | No Shift | | | | 17.19 | 137.52 | 8 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 6/30/2014 | | 6/30/2014 | | 1 | Regular 1 | | | No Shift | | | | | 15079.35 | 910.04 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 6/30/2014 | | 6/30/2014 | | 100 | Overtime 1.5 | | | No Shift | | | | | 2937.96 | 118.18 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 6/30/2014 | | 6/30/2014 | | 100 | Overtime 1.5 | | | No Shift | | | | | 779.13 | 31.34 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 6/30/2014 | | 6/30/2014 | | 100 | Overtime 1.5 | | | No Shift | | | | | 2304.51 | 92.7 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51035 | | H | 6/30/2014 | | 6/30/2014 | | 210 | Holiday | | | No Shift | | | | | 662.8 | 40 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51045 | | H | 6/30/2014 | | 6/30/2014 | | 220 | Jury Duty | | | No Shift | | | | | 132.56 | 8 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51045 | | H | 6/30/2014 | | 6/30/2014 | | 608 | TXI Corp IC | | | No Shift | | | | | 250.69 | |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51045 | | H | 6/30/2014 | | 6/30/2014 | | 675 | TXI Prod IC | | | No Shift | | | | | 3931.99 | |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51057 | | H | 6/30/2014 | | 6/30/2014 | | 800 | VacH-Cur Yr | | | No Shift | | | | | 662.8 | 40 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51045 | | H | 6/30/2014 | | 6/30/2014 | | 990 | TXI-OtherPay | | | No Shift | | | | | 434.63 | 26.23 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51045 | | H | 6/30/2014 | | 6/30/2014 | | 990 | TXI-OtherPay | | | No Shift | | | | | 132.56 | 8 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 7/18/2014 | | 7/18/2014 | | 1 | Regular 1 | | | No Shift | | | | | 2235.79 | 134.93 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 7/18/2014 | | 7/18/2014 | | 100 | Overtime 1.5 | | | No Shift | | | | | 24.86 | 1 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 7/18/2014 | | 7/18/2014 | | 100 | Overtime 1.5 | | | No Shift | | | | | 378.37 | 15.22 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 7/18/2014 | | 7/18/2014 | | 100 | Overtime 1.5 | | | No Shift | | | | | 330.14 | 13.28 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51035 | | H | 7/18/2014 | | 7/18/2014 | | 210 | Holiday | | | No Shift | | | | | 132.56 | 8 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51057 | | H | 7/18/2014 | | 7/18/2014 | | 800 | VacH-Cur Yr | | | No Shift | | | | | 265.12 | 16 |

| Employee | Employee Name | Group | Reg | Div | Dist | Home Business Unit | Charge to Business Unit | Obj Acct | Dept | Pay Class | Check Date | Work Order Number | Date Worked | Base Pay Rate | PDBA Code | PDBA Description | Pay Rate | Shift Code | Shift Descr | Shift Diff. | Uprate Amount | Adjusted Pay Rate | Gross Pay | Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 7/25/2014 | | 7/20/2014 | 16.57 | 1 | Regular 1 | 16.57 | | No Shift | | | 16.57 | 132.56 | 8 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 7/25/2014 | | 7/20/2014 | 16.57 | 1 | Regular 1 | 16.57 | | No Shift | | | 16.57 | 530.24 | 32 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 7/25/2014 | | 7/20/2014 | 24.855 | 100 | Overtime 1.5 | 24.855 | | No Shift | | | 24.855 | 4.23 | 0.17 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 7/25/2014 | | 7/20/2014 | 24.855 | 100 | Overtime 1.5 | 24.855 | | No Shift | | | 24.855 | 128.5 | 5.17 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 8/1/2014 | | 7/27/2014 | 16.57 | 1 | Regular 1 | 16.57 | | No Shift | | | 16.57 | 530.24 | 32 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 8/1/2014 | | 7/27/2014 | 16.57 | 1 | Regular 1 | 16.57 | | No Shift | | | 16.57 | 132.56 | 8 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 8/1/2014 | | 7/27/2014 | 24.855 | 100 | Overtime 1.5 | 24.855 | | No Shift | | | 24.855 | 106.13 | 4.27 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 8/1/2014 | | 7/27/2014 | 24.855 | 100 | Overtime 1.5 | 24.855 | | No Shift | | | 24.855 | 13.17 | 0.53 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 8/8/2014 | | 8/3/2014 | 16.57 | 1 | Regular 1 | 16.57 | | No Shift | | | 16.57 | 662.8 | 40 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 8/8/2014 | | 8/3/2014 | 24.855 | 100 | Overtime 1.5 | 24.855 | | No Shift | | | 24.855 | 12.43 | 0.5 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 8/8/2014 | | 8/3/2014 | 24.855 | 100 | Overtime 1.5 | 24.855 | | No Shift | | | 24.855 | 134.22 | 5.4 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 8/15/2014 | | 8/10/2014 | 16.57 | 1 | Regular 1 | 16.57 | | No Shift | | | 16.57 | 662.8 | 40 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 8/15/2014 | | 8/10/2014 | 24.855 | 100 | Overtime 1.5 | 24.855 | | No Shift | | | 24.855 | 394.45 | 15.87 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 8/22/2014 | | 8/17/2014 | 16.57 | 1 | Regular 1 | 16.57 | | No Shift | | | 16.57 | 662.8 | 40 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 8/22/2014 | | 8/17/2014 | 24.855 | 100 | Overtime 1.5 | 24.855 | | No Shift | | | 24.855 | 350.95 | 14.12 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 8/29/2014 | | 8/24/2014 | 16.57 | 1 | Regular 1 | 16.57 | | No Shift | | | 16.57 | 662.8 | 40 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 8/29/2014 | | 8/24/2014 | 24.855 | 100 | Overtime 1.5 | 24.855 | | No Shift | | | 24.855 | 200.83 | 8.08 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 9/5/2014 | | 8/31/2014 | 16.57 | 1 | Regular 1 | 16.57 | | No Shift | | | 16.57 | 662.8 | 40 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 9/5/2014 | | 8/31/2014 | 24.855 | 100 | Overtime 1.5 | 24.855 | | No Shift | | | 24.855 | 12.43 | 0.5 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 9/5/2014 | | 8/31/2014 | 24.855 | 100 | Overtime 1.5 | 24.855 | | No Shift | | | 24.855 | 148.38 | 5.97 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 9/12/2014 | | 9/7/2014 | 16.57 | 1 | Regular 1 | 16.57 | | No Shift | | | 16.57 | 530.24 | 32 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 9/12/2014 | | 9/7/2014 | 24.855 | 100 | Overtime 1.5 | 24.855 | | No Shift | | | 24.855 | 412.59 | 16.6 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51035 | | H | 9/12/2014 | | 9/7/2014 | 16.57 | 210 | Holiday | 16.57 | | No Shift | | | 16.57 | 132.56 | 8 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 9/19/2014 | | 9/14/2014 | 16.57 | 1 | Regular 1 | 16.57 | | No Shift | | | 16.57 | 662.47 | 39.98 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 9/19/2014 | | 9/14/2014 | 24.855 | 100 | Overtime 1.5 | 24.855 | | No Shift | | | 24.855 | 0.5 | 0.02 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 9/19/2014 | | 9/14/2014 | 24.855 | 100 | Overtime 1.5 | 24.855 | | No Shift | | | 24.855 | 187.16 | 7.53 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 9/26/2014 | | 9/21/2014 | 16.57 | 1 | Regular 1 | 16.57 | | No Shift | | | 16.57 | 530.24 | 32 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 9/26/2014 | | 9/21/2014 | 24.855 | 100 | Overtime 1.5 | 24.855 | | No Shift | | | 24.855 | 189.64 | 7.63 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51030 | | H | 9/26/2014 | | 9/21/2014 | 16.57 | 800 | VacH-Cur Yr | 16.57 | | No Shift | | | 16.57 | 132.56 | 8 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 10/10/2014 | | 10/5/2014 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.6 | 40 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 10/10/2014 | | 10/5/2014 | 25.785 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 448.66 | 17.4 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 10/17/2014 | | 10/12/2014 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.26 | 39.98 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 10/17/2014 | | 10/12/2014 | 25.785 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 0.52 | 0.02 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 10/17/2014 | | 10/12/2014 | 25.785 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 185.65 | 7.2 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 10/24/2014 | | 10/19/2014 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 550.08 | 32 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 10/24/2014 | | 10/19/2014 | 25.785 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 206.28 | 8 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 10/24/2014 | | 10/19/2014 | 25.785 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 228.97 | 8.88 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51030 | | H | 10/24/2014 | | 10/19/2014 | 17.19 | 800 | VacH-Cur Yr | 17.19 | | No Shift | | | 17.19 | 137.52 | 8 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 10/31/2014 | | 10/26/2014 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.6 | 40 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 10/31/2014 | | 10/26/2014 | 25.785 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 228.97 | 8.88 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 11/7/2014 | | 11/2/2014 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.26 | 39.97 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 11/7/2014 | | 11/2/2014 | 25.785 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 0.77 | 0.03 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 11/7/2014 | | 11/2/2014 | 25.785 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 357.12 | 13.85 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 11/14/2014 | | 11/9/2014 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.6 | 40 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 11/14/2014 | | 11/9/2014 | 25.785 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 498.42 | 19.33 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51010 | | H | 11/14/2014 | | 11/9/2014 | 25.785 | 100 | Overtime 1.5 | 25.785 | | No Shift | | | 25.785 | 887.52 | 34.42 |
| 725641 | DAVIS, NEAL | 99 | 99 | 99 | 99 | 54071 | 54071 | 51005 | | H | 11/21/2014 | | 11/16/2014 | 17.19 | 1 | Regular 1 | 17.19 | | No Shift | | | 17.19 | 687.6 | 40 |

1    Q.    That's not correct, is it?

2    A.    Yes, it is.

3    Q.    You got paid overtime every week.  Correct?

4    A.    I worked -- that's the reason I said I want to

5  go back to Exhibit 10.

6    Q.    I want you to answer my questions.

7          So you were paid overtime almost every week.

8  Correct?

9    A.    Almost, correct.

10    Q.    In fact, we went through where there were --

11  that one thing that we looked at where there were

12  multiple days where you worked over ten hours in a day.

13  Correct?

14    A.    Correct.

15    Q.    And you agreed with me that when you worked

16  over eight hours, you got paid the overtime.  Correct?

17    A.    That's the part I say I want to go back to.

18  Because even though I worked and clocked out, I was

19  called back to -- "Hey, I need you to stay over to

20  offload a truck.  We got a person that's called in."

21  That's the time I'm complaining about I wasn't paid for.

22    Q.    So let me press pause then.  So what you're

23  saying is that you would -- like after 12 hours or 10

24  hours or 11 hours, on occasion you would either go the

25  two-minute walk away from the warehouse or the

1    Q.    You just don't remember?

2    A.    Yeah.  Yes, I do remember now.

3    Q.    Okay.

4    A.    Looking over the document here, there's

5    something I'd like to go back to on Exhibit 10.

6    Q.    Let's hold on and let me ask you some questions

7    first.

8    A.    Okay.

9          (Exhibit No. 31 was marked.)

10   Q.    I'm going to show you what's been marked as

11   Deposition Exhibit 31.  Is Deposition Exhibit 31 a true

12   and correct copy of your Second Amended Objections and

13   Responses to Interrogatories?

14   A.    Correct.

15   Q.    Pardon?

16   A.    Yes.

17   Q.    And you verified these.  Correct?

18   A.    Yes.

19   Q.    Is that your signature on the back page where

20   you verified that these were --

21   A.    Yes.

22   Q.    -- verified these answers on March 7 of 2020?

23   A.    Yes.

24   Q.    And so in Interrogatory No. 1, you were called

25   upon to explain your claim that you didn't get paid



1    overtime that was owed to you.  Correct?

2         A.    Correct.

3         Q.    And so the points that you made -- in the first

4    sentence you said "He was required to work such time for

5    unload, offload and inventory duties that he was told

6    must be done before he went home."  Correct?

7         A.    Correct.

8         Q.    And so that's at the end of the day.  Correct?

9         A.    Correct.

10        Q.    So the two points that you raised in

11   Interrogatory No. 1 is that you claim that you had to

12   work beyond your eight hours at the end of the day.

13   Correct?

14        A.    Correct.

15        Q.    And you also claim that your lunch was short or

16   denied.  Correct?

17        A.    Correct.

18        Q.    And that's the only things that you had

19   indicated support your FLSA claim.  Correct?

20        A.    True.

21        Q.    And in the first sentence of your interrogatory

22   you say "To the best of plaintiff's recollection, he

23   worked more than 40 hours in a week on a regular

24   consistent basis without being paid overtime"?

25        A.    Correct.



```
 1   Correct?

 2        A.     Correct.

 3        Q.     And two, where you said that during your

 4   regular half hour lunch period, you were told "Go out

 5   there and do some work"?

 6        A.     Correct.

 7        Q.     Anything else?

 8        A.     No.

 9        Q.     And when you were saying, "I want to look at

10   the time detail," we did look at that Exhibit 10 time

11   detail.  Correct?

12        A.     Correct.

13        Q.     Several times.  Correct?

14        A.     Correct.

15        Q.     And what that exhibit showed us is that there

16   were a number of occasions where you went to your

17   supervisor and said -- and you had looked at your time

18   detail and you said there was something wrong, and your

19   supervisor went in and fixed it.  Right?  Where it would

20   show that you were tardy and the supervisor would go in,

21   type something into the Kronos system, and it would show

22   up corrected.  Right?

23        A.     That's when I was telling you about time frames

24   that he didn't do it that I told him about.  I won't see

25   it until I get my paycheck, that he didn't fix it.
```



1    Q.    Right.  I think you said there were twice that

2    that happened.

3    A.    I said numerous occasions.  Not just twice.

4    Q.    Well, the record will --

5    A.    I'm saying that when my work -- there had been

6    occasions -- and you can call Eric -- call him up and ask

7    him yourself.  There's been occasions that he asked me,

8    "Hey, I need you to stay for inventory" or "I need you to

9    stay to -- I've got a truck coming in."  "When is it

10   going to be here?"  "They say 45 minutes."  So I wait.

11   Truck get there.  I offload it, whatever time that be.

12   That happened on numerous occasions.  Not just that one

13   particular day.  That's what I was talking about.

14   Q.    We don't know what day.  Right?

15   A.    Say again.

16   Q.    We don't know a day.  Correct?

17   A.    Day of the month, year, I can't get that, but

18   it happened a lot.

19   Q.    Did anyone prevent you from clocking back in?

20   A.    No.

21   Q.    Did you ask to clock back in?

22   A.    Well, during that rule when you clock out --

23   Q.    That's not my question.

24   A.    No.  That wasn't the procedure.

25   Q.    That wasn't my question either.  I said did

1    anybody prevent you from clocking back in?

2        A.    No.

3        Q.    All you had to do was stick your finger on the

4    Kronos machine.  Correct?

5        A.    That wasn't the procedure.

6        Q.    That's not my question.  All you would have to

7    do to clock back in is stick your finger on the Kronos

8    machine.  Correct?

9        A.    Correct.

10       Q.    So if somebody asked you to come back, all you

11   would have to do is walk to the Kronos machine, put your

12   finger on it, and it would show you clocking in.

13   Correct?

14       A.    Correct.

15       Q.    And when you got done, all you had to do was

16   stick your finger on the Kronos machine and it would have

17   clocked you out.  Correct?

18       A.    Correct.

19       Q.    And nobody ever told you you couldn't do that.

20   Correct?

21       A.    No one never told me I couldn't do it, but the

22   general rule was that once you clocked out --

23       Q.    What rule?

24       A.    -- you do not clock back in.  You don't double

25   clock in because you'll screw up Kronos.  Kronos will

1    think you're clocking back in, but they'll take care of

2    it.  Eric Wilson will take care of.  Due to the system

3    itself, if I was to try to clock in -- I'm clocked out.

4    Come back in for Kronos, if I clock back in, the system

5    will think I'm starting my day -- starting the day over

6    instead of giving me time.

7        Q.    Well, it would think you're starting your day

8    over.

9        A.    Say it again.

10       Q.    Yes, it would think you're starting back into

11   work.

12       A.    Yeah, but occasionally it happened that it --

13   your whole eight hours -- if I had eight hours in there

14   and I came back in there and I worked for 45 minutes, the

15   system say I worked -- when the payroll come out, it's

16   going to say 45 minutes instead of 8 hours and 45

17   minutes.  So he has to go into Kronos and input that in

18   there.

19       Q.    Do you have a very good understanding of how

20   Kronos works?

21       A.    Yes.

22       Q.    Okay.  Are you sure?

23       A.    Yes.  I mean, Kronos -- the system we had --

24   the first system we had was -- well, I shouldn't say.

25   The first system we had did not work the way it worked

LEXITAS

```
 1    now.
 2        Q.    Let me just say --
 3        A.    Totally different.
 4        Q.    So the way Kronos works is, like, you clock in
 5    and you clock out.  Correct?  You've got your finger on
 6    the button?
 7        A.    Correct.
 8        Q.    And then once you clock out, if you stick your
 9    finger back on the button as you've just testified, it
10    will show you clocking back in?
11        A.    Yes.
12        Q.    And you'll stay clocked in until you put your
13    finger on the button again and clock out.  Correct?
14        A.    Correct.
15        Q.    So nobody told you you couldn't do that twice
16    in a day?
17        A.    Correct.  The reason why -- it just came to me,
18    the reason why they say don't do that.  If I was to clock
19    out and clock back in, it's going to give -- it's like a
20    call-in basically.  It's like they have some -- it's like
21    they called me back in to pay me for three hours.  And if
22    I only worked 15 minutes, then Kronos is going to give me
23    three hours.  If I worked -- it pays you up to three
24    hours if you clock back in.  They didn't want that to
25    happen because sometimes the job may take 20 minutes.  It
```

1    may take an hour.  But it's going to automatic give me

2    three hours.  They didn't want that.  They want to give

3    you the actual physical hours that you worked.  That's

4    what it was.

5         Q.    Who had that conversation with you?

6         A.    I mean, that's how the system worked.

7         Q.    Did anybody tell you that you could not clock

8    back in?

9         A.    They preached that.  Unless you physically

10   called back in on -- unless you went home and physically

11   was called back in, you get an automatic three hours.

12   The machine was set up to give you three hours instead of

13   15 minutes or 20 minutes or an hour.  That's the reason

14   why they didn't want you to clock back in.

15        Q.    What I'm asking you is did anybody -- I think

16   you testified that you don't recall anybody telling you

17   that you could not clock back in.  Is that correct?

18              MR. BHATTI:  Objection, form.

19        A.    I won't say --

20        Q.    (BY MR. BIRRER) Or it's not correct.  I'm just

21   asking you.

22        A.    My thing is I want to make sure that on the

23   record I know that's the reason why they didn't want --

24   if you was already existing at the plant, they didn't

25   want you to do that because it automatically gave you

 1  three hours for a call-in.  That was the main reason.

 2  The supervisor fixed that -- was supposed to fix those

 3  errors.

 4      Q.    So you're saying that -- I just want to get

 5  back to my question.  And you've told me why, but sitting

 6  here today, you don't -- when you were asked to clock

 7  back in after you clocked out -- when you were asked to

 8  go back to work after you clocked out, you don't have a

 9  recollection of anybody telling you that you cannot clock

10  back in?

11      A.    No.

12      Q.    So you're agreeing with me?

13      A.    Correct.

14      Q.    Okay.  Who was Dell Panther?

15      A.    He was the prior supervisor in 2010.  He was

16  supervisor before Lucy Tovar.

17      Q.    He wrote you up once, didn't he?

18      A.    Yes, he did.

19      Q.    And that was right around September 7 of 2010?

20      A.    That's about correct.

21      Q.    What did Mr. Panther write you up about?

22      A.    I can't recall exactly what he wrote me up for.

23  It was like -- it was a double-standard.

24      Q.    A what?

25      A.    I can't recall what he wrote me up about, but

**bIN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **NEAL DAVIS,** | § | |
| **On Behalf of Himself and** | § | |
| **All others Similar Situated** | § | |
| | § | **CIVIL ACTION NO.** |
| **Plaintiff,** | § | |
| | § | **3:16-CV-01312-L** |
| **v.** | § | |
| | § | |
| **MARTIN MARIETTA MATERIALS,** | § | |
| **INC.** | § | |
| | § | |
| **Defendant.** | § | |

**PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT MARTIN**
**MARIETTA MATERIALS, INC.'S FIRST SET OF INTERROGATORIES**

TO:   Defendant, Martin Marietta Materials, Inc., by and through its counsel of record, Mike Birrer, Carrington, Coleman, Sloman & Blumenthal, L.L.P., 901 S. Main Street, Suite 5500, Dallas, Texas 75202.

Plaintiff hereby serves his objections and responses to Defendant's First Set of Interrogatories to Plaintiff.

Respectfully submitted,

**THE BHATTI LAW FIRM, PLLC**

/s/Vincent J. Bhatti
Vincent J. Bhatti
State Bar No. 24055169
Ditty S. Bhatti
State Bar No. 24062803
14785 Preston Road
Suite 550
Dallas, Texas 75254
(214) 253-2533 (Telephone)
(214) 279-0033 (Facsimile)
vincent.bhatti@bhattilawfirm.com
ditty.bhatti@bhattilawfirm.com
**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record of all parties to the above cause in accordance with the Federal Rules of Civil Procedure, on January 10, 2019.

Mike Birrer
Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main Street, Suite 550
Dallas, TX  75202
*Attorneys for Defendant*

/s/*Vincent J. Bhatti*
Vincent J. Bhatti

## <u>GENERAL OBJECTIONS</u>

1.      Plaintiff objects to Defendant's First Set of Interrogatories to the extent that they seek to impose obligations beyond those provided for by applicable law.  Plaintiff responds to these requests by giving each term, word, and phrases its usual, customary and ordinary meaning, and in accordance with the scope of discovery mandated by applicable law, and reserves the right to amend, supplement, or clarify its responses to the requests in the future.

2.      Plaintiff objects to Defendant's First Set of Interrogatories to the extent that they inquire about attorney-client communications, attorney work product, party communications, trial preparation materials, confidential information, proprietary information or to its materials or communications which are privileged or exempt from discovery.  Plaintiff specifically withholds from discovery all attorney-client communications between Plaintiff and its counsel, including attorney-client communications and work product of Plaintiff's counsel.  Plaintiff objects to including any log for such material created after the anticipation of litigation in this matter.

3.      Plaintiff objects to Defendant's First Set of Interrogatories to the extent that they seek information or documents that are equally available to Defendant and Plaintiff.

4.      Plaintiff objects to these requests to the extent they are vague, overly broad in time or scope, unduly burdensome or seek information which is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

5.      Plaintiff objects to the these interrogatories to the extent that they seek information that is not relevant to the subject matter of this litigation and not reasonably expected to yield information relevant to the allegations of the complaint, to the proposed relief, or to the defenses of any Defendant.

6.      Plaintiff objects to the interrogatories to the extent that they seek the premature discovery of expert testimony.  Plaintiff will submit expert reports and make their experts available for deposition pursuant to the Scheduling Order.

7.      Plaintiff objects to the interrogatories to the extent they seek to impose an obligation on Plaintiff to provide information for or on behalf of any person or entity other than Plaintiff, and/or seek information that is not in Plaintiff's possession, custody, or control.

8.      Plaintiff objects to the interrogatories to the extent that discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive.

9.      Plaintiff objects to the interrogatories to the extent they do not adequately define terms used in them.

10.     Each of the following responses to Defendant's First Set of Interrogatories incorporates by reference each of the foregoing General Objections and is expressly conditioned

upon and subject to and without waiver of each of the foregoing General Objection.

## INTERROGATORIES

**INTERROGATORY NO. 1.**        Identify each workweek on which You contend Martin Marietta required You to complete a workload that resulted in an excess of 40 hours and failed to compensate You for overtime hours worked. This includes each time You contend You were forced to work through lunch and that such lunchtime work resulted in an excess of 40 hours worked that workweek. For each workweek, specify:

> (a) The dates for the workweek;
> (b) The person, policy, or employment practice that required You to work in excess of 40 hours that week;
> (c) Whether You were forced to work through lunch and, if so, on which days; and
> (d) The person, if any, to whom You stated that You were not compensated appropriately for overtime hours worked.

RESPONSE:  To the best of Plaintiff's recollection he worked more than forty (40) hours in a week on a regular and consistent basis without being paid overtime.  He was required to work such time for unload, offload and inventory duties that he was told must be done before he went home.  Plaintiff recalls averaging 15 hours of overtime period week.  Plaintiff's lunch hour was regularly and consistently either shortened or denied altogether because he was required to unload or offload a truck and/or do inventory immediately.

**INTERROGATORY NO. 2.**        Describe all factual bases and legal theories to support Your contention that You were "highly qualified" for the position of Human Resource Manager at the time You applied for the position.

RESPONSE:  Plaintiff objects to this request to the extent it requires Plaintiff to provide legal opinion.  Notwithstanding such objection, Plaintiff states that he was a United States Army Recruiter for eight (8) years from June 1996 to September 2004.  In addition, Plaintiff holds a Bachelor's Degree in Human Resources and had almost ten (10) years of experience inside Martin Marietta.

**INTERROGATORY NO. 3.**        Describe all factual bases and legal theories to support Your contention that You were "highly qualified" for the position of Planner at the time You applied for the position.

RESPONSE:  Plaintiff objects to this request to the extent it requires Plaintiff to provide legal opinion. Notwithstanding such objections, Plaintiff states he had experience in planning in the United States Army from 1984 to 2004.  He was highly experienced and skilled in long range and short term planning in this role.  In addition, he had almost ten (10) years of experience at

Marietta Martin ordering parts in the storeroom which was a very similar skill to the primary skills necessary for the Planner position.

INTERROGATORY NO. 4.       Identify all communications related to Your application for and rejection from the position of Human Resource Manager.

RESPONSE:  Plaintiff objects to this request as vague and not calculated to lead to admissible evidence.  Notwithstanding such objections, Plaintiff states he applied for the HR job with a lady named Karen McDonald who was a temporary HR manager.  She stated to Plaintiff that she did not understand why they overlooked Plaintiff for the position of HR Manager given that Plaintiff was much more experienced with the company and much more education than the young lady that was selected.  Another male supervisor at Martin Marietta stated that only females get HR jobs and office jobs at that plant and that's why you did not get the job.  Plaintiff was told by the Bridget Hurst that she found out about the job because the plant manager had called her and asked her to reapply after receiving Plaintiff's application and expressions of interest.  Plaintiff was not called for an interview by HR.  In fact, Plaintiff called the HR Director to try to interview for the job.  In the interview, the HR Director asked Plaintiff how he felt working around women.  He stated that he had plenty of experience working with women with no issues.  Karen McDonald told Plaintiff that it looks like the Plant Manager and Director of HR had decided to give Bridget the job before considering an interview for Plaintiff.  Karen told Plaintiff it was unfair the way they overlooked Plaintiff for the HR job.  Karen told Plaintiff to hang in there and apply to the Planner position.

INTERROGATORY NO. 5.       Identify all communications related to Your application for and rejection from the position of Planner.

RESPONSE:  Plaintiff objects to this request as vague and not reasonably calculated to lead to admissible evidence.  Notwithstanding such objections, Plaintiff states that he applied for the Planner postion with Jason Crowther (assistant plant manager).  Plaintiff followed up with Jason on a weekly basis for a four (4) month period.  Jason admitted that Plaintiff was qualified for the position on many occasions.  Another Martin Marietta maintenance worker and many other employees stated that they were grooming Jason's secretary, Leann, for that job.  Jason told me he would post the results of the selection after thanksgiving when I inquired.  ON January 20th, I followed up with Jason again on the Planner position.  He said he would know by January 22nd.  On January 22, 2016, I saw Bridget, the plant manager and Leann getting into a truck to go to lunch together.  I followed up with Bridget asking her whether I was getting the position.  She told me to wait until after lunch.  Upon returning from lunch, Bridget called me into an office with Eric Wilson who read a termination letter to me.  They tried to say I was late by 1-2 minutes on more than 20 occasions but I clarified that the Martin Marietta rule is that lateness is 7 minutes or more.  I also stated that no one warned me or told me I was being late.

**INTERROGATORY NO. 6.**        Describe the occasion on which You contend an individual in the Human Resources Department told You that "if you want to be promoted you should leave the company."

RESPONSE:  At the end of December 2015, Plaintiff had identified the female HR manager on the floor of the warehouse.  They stepped into Plaintiff's boss' office upon Plaintiff's request. Plaintiff complained to the HR Manager that he was being overlooked for these jobs that he was very qualified for based on his gender and race.  She stated that if you feel like you are being discriminated against based on gender and race then you should probably go outside the company to get another job.  It took place in Eric Wilson's office.

**INTERROGATORY NO. 7.**        Describe the occasion on which You contend a co-worker told You that You were "the wrong skin color for a particular job." In addition to the information listed in Instruction 3, also identify the specific job to which this comment related.

RESPONSE:  In 2015, Clint Gilley, a maintenance worker, was talking with Plaintiff and he said you can call it what you want but you are wrong skin color for that job.  He went on to ask Plaintiff how many black people have been in the front office or the HR.  In addition, in 2015, Danny Thursby, a maintenance supervisor, told Plaintiff not to get his hopes up because they already selected someone for that job and implied it would be Jason's secretary, Leann.

**INTERROGATORY NO. 8.**        Describe all factual bases and legal theories to support Your contention that You were terminated based on Your race.

RESPONSE:  Plaintiff objects to this request to the extent it calls for a legal opinion, not reasonably calculated to lead to admissible evidence, not reasonably limited in time/scope, overbroad, vague, and unduly burdensome.  Notwithstanding such objections, Plaintiff states that Mike Martinez said that on the day that Plaintiff was terminated Martin Marietta had a meeting saying that everyone must take their lunch breaks and clock-in/clock-out.  In 2008, someone hung a noose at that plant.  Plaintiff was one of the primary people who complained about the incident and he believes he was labeled a troublemaker from that point forward.   After terminating Plaintiff from his position Martin Marietta hired Martin, a Caucasian to replace him.

**INTERROGATORY NO. 9.**        Identify each act, conduct, communication, or employment practice that You contend constituted discrimination on the basis of Your race or sex.

RESPONSE:  Plaintiff objects to this request to the extent it calls for a legal opinion, not reasonably calculated to lead to admissible evidence, not reasonably limited in time/scope, overbroad, vague, and unduly burdensome.  Notwithstanding such objections, Plaintiff states that he was overlooked for two jobs that he was clearly qualified based on his race/gender namely the HR Manager and Planner positions.  The people selected were much less qualified, female and Caucasian.  Plaintiff further points out to the failure to promote or hire minorities and men for

the front office and/or HR.   Plaintiff further points out that there are little to no minority supervisors.  Plaintiff reported the discrimination on a regular basis and Martin Marietta simply ignored it and told him he always had the option to quit his job and look for a better position with another company.

**INTERROGATORY NO. 10.**      Identify each individual outside Your protected class whom You contend was treated differently from You with regard to promotions and/or hiring decisions at Martin Marietta. For each individual, in addition to the information described in Instruction 1, also specify:

(a) The characteristics You contend place this individual outside Your protected class;

(b) How this individual is otherwise similarly situated to You;

(c) The occasion on which You contend this individual received preferential treatment; and

(d) The Martin Marietta employee who You contend gave that individual such preferential treatment

RESPONSE:  Plaintiff would put forth that each female Caucasian employee hired instead of him for the Planner (Leann) and HR Manager (Bridget Hurst) job was treated better than him as they were both not as qualified for their respective positions by education or experience with the company.  He believes that Randy Walsh hired for the HR job and Jason hired for the planner position.  Carl Weatherford was regularly late more than 7 minutes and he was Caucasian and not terminated. The regularly changed the Kronos read out for him because he was officially late regularly based on the 7 minute rule.

**INTERROGATORY NO. 11.**      Identify every time on which You contend You "received high praise" for Your work performance. For each such time, specify:

(a) The date on which the praise was communicated to You;

(b) The person giving You such praise;

(c) The method by which the praise was communicated;

(d) The specific praise that was given; and

(e) Any other individuals who were present when You received such praise.

RESPONSE:  In 2013, Plaintiff received a $1 raise.  In 2015, Plaintiff and Mike Martinez were taken to lunch by Eric Wilson.  Eric Wilson would let Plaintiff know he did a good job at least twice a month.  Jason would give Plaintiff regular compliments about job performance and the maintenance supervisor would comment regularly that Plaintiff was doing a good job.  On that date of Plaintiff's termination, Eric Wilson stated "Man, I don't want to do this, but my hands are tied and they are making me do this."   Hr manager was there listening to Eric making this comment.  Eric Wilson was even crying on the day of Plaintiff's termination and said "this is not right."  Plaintiff asked Eric Wilson if they were firing him to give Leann the job, he stated yes.

**INTERROGATORY NO. 12.**      If You contend Martin Marietta did not exercise reasonable care to prevent and promptly correct discriminatory conduct, describe with particularity Martin Marietta's actions or inactions that show a failure to exercise reasonable care to prevent and promptly correct discriminatory conduct.

RESPONSE:  Plaintiff objects to this request as vague and not reasonably calculated to lead to admissible evidence.   Plaintiff cannot be expected to describe inaction with particularity. Plaintiff reported discrimination directly to HR and to many other managers.   Plaintiff's complaints were never investigate or otherwise addressed with him.   Instead, he was fired less than a month after directly speaking to the HR manager in Eric Wilson's office about the discrimination.

**INTERROGATORY NO. 13.**      What is the method You used to calculate the amount of damages You seek in this Lawsuit?  Identify the calculations, amount for each of type of damage, factual basis, and any documents on which You rely.

RESPONSE:  Plaintiff was unemployed between January 22, 2016 and about September 20, 2016 when he got another job making more money.  He made $17.80 per hour plus benefits and worked on average of 55 hours per week.  $17.80 x 55 hours per week = $979 per week x 35 weeks = $34,265.00.  Half time:  $8.9 per hour x 15 hours OT per week = $133.5 OT per week x 35 weeks = $4,672.50.   Plaintiff suffered significant mental and emotional pain from this termination.  He was already diagnosed with PTSD given his time in the Army in 2012 or 2013. Yet, he lost over 23 pounds after his termination and could not sleep at all.  He was prescribed a sleeping medication due to his termination.  Plaintiff calculated his mental/emotional damages at $50,000.00.  Plaintiff lost his house as a result of his termination and was forced to move to a rental property and estimates damages of $50,000.00.  Plaintiff lost his health, dental and vision benefits.  Plaintiff estimates this value for 35 weeks to be valued at approximately $7,000.00.

**INTERROGATORY NO. 14.**      Identify every healthcare provider who has provided You with any medical, physical, psychological, psychiatric, or mental health treatment, counseling, or consultation, since January 1, 2016.

RESPONSE:  Plaintiff objects to this request as overbroad, unduly burdensome, vague and not reasonably calculated to lead to admissible evidence.  Notwithstanding such objections, Plaintiff states that he has been treated by Dr. Barry J and Dr. Fornito A. at the Fort Worth VA.  Plaintiff also stated that he has been treated by Dr. Jeffrey Fisher at the Mansfield Urgent Clinic.

**INTERROGATORY NO. 15.**      Identify each person with whom You have applied for employment after the termination of Your employment with Martin Marietta. For each person, specify:

(a) The name of the person;
(b) The date on which You applied;

(c) The status of Your application;

(d) The date on which You interviewed, if applicable;

(e) The date of any rejection or offer of employment; and

(f) For any position You turned down, the reason for Your rejection of the offer.

RESPONSE:  Plaintiff refers Defendant to his documents produced.

**INTERROGATORY NO. 16.**      Identify all income, compensation, and benefits received by You from the termination of Your employment with Martin Marietta, through the date of trial. This includes, but is not limited to, income received through employment, self-employment, contract work, unemployment compensation, workers' compensation, social security or disability benefits of any kind, spousal support, or any income reflected on an IRS Form 1099.

RESPONSE:  Plaintiff received approximately $11,000 in unemployment before obtaining his first job on approximately September 20, 2016 as an Officer Manager/Planner making $25 per hour plus benefits, keeping orders, inventory, supervising personnel until August 2018 at All-Pro Distribution in Carrollton, Texas.  He resigned that position to take a job at the VA in August 2018 as a Logistics Manager making $54K per year plus benefits, ordering  inventory and purchasing for the VA.  He resigned that position in March 2019 to take a job at the Department of Labor in March 2019 making $57K per year plus benefits and serving as a Safety/Compliance officer for mines.

**INTERROGATORY NO. 17.**      Identify all employment benefits of any kind You have received from any source from the termination of Your employment with Martin Marietta through the date of trial, including, but not limited to, life insurance, health insurance, vision or dental insurance, 401(k) contributions, pension plan contributions, and/or profit-sharing contributions or payments.

RESPONSE:  Plaintiff received no benefits until he started his position with All Pro on or about September 20, 2016.  Since that time, Plaintiff has received similar or better benefits than received at Martin Marietta.

**INTERROGATORY NO. 18.**      Describe the factual basis and/or legal theories for Your contention that You have suffered mental anguish. This includes, but is not limited to, all conditions, symptoms, and related dates.

RESPONSE:  Plaintiff objects to this request to the extent it requests legal conclusion/opinion. Plaintiff further objects to this request a vague and not reasonably limited in scope/time. Notwithstanding such objections, Plaintiff states he lost over 23 pounds, and could not sleep.  He was prescribed a sleeping medicine and his PTSD condition was increased due to the mental anguish from his wrongful termination from a position he held almost 10 years.

**INTERROGATORY NO. 19.**      If You denied Request for Admission No. 10, identify each occasion on which You reported alleged discrimination in the workplace.

RESPONSE:  Plaintiff objects to this request as not reasonably calculated to lead to admissible evidence and not reasonably limited in time/scope as well as vague.  Notwithstanding such objections, Plaintiff states he reported discrimination to the HR manager directly in-person in late 2015.  He reported discrimination regarding his being passed up for the HR manager job and/or the Planner job at least twice a month.  He would report his complaints of discrimination to Eric Wilson, Mike Martinez, Jason, Maintenance Managers, HR manager.  Plaintiff reported discrimination on at least 10 occasions to different managers all in 2015 and one time in 2016 just before his termination.